## Appeal of Stewart, Executor, and McClay.

1. An executor who retains goods of his testator is liable for their value. The appraised value of the goods as shown in an inventory regularly made and filed is *prima facie* correct, but may be rebutted by competent evidence.

2. A testator died possessed of an interest in a banking copartnership, represented by certain " shares of stock " therein. The partnership articles provided that a majority of the partners or " stockholders," as they were termed, might, upon the death of any of their number, purchase his " stock " or partnership interest at a valuation to be ascertained by the officers of the bank upon notice to the legal representatives of the deceased. The " stock " was appraised at its par value, $100 per share. Some years after the decedent's death the valuation was regularly made and the value ascertained to be $83, at which price the bank purchased 83 shares. The remaining shares the executor transferred to himself at the same price and charged himself accordingly in his account. Afterwards the executor received in dividends from this stock $64 per share, and the stock was worth at the time of filing the account $126 per share. It was claimed before the Auditor that the accountant should be charged with this value of the stock *plus* dividends received. The exception filed to the account however was that the accountant " should be charged with the full value of the Juniata Valley Bank stock as it was appraised "; the exception to the Auditor's report and the assignment of error were similarly worded:
   *Held*, (1) that the purchase by the accountant of his testator's interest was voidable at the instance of the parties interested, not on the ground of actual fraud, but from public policy.
   (2) That the demand of the exceptants being only that the accountant should be charged with the appraised value of the stock they had thereby elected to treat him as the owner and therefore entitled to retain the dividends he received.
   (3) And that consequently the accountant should be charged only with the appraised value of the stock, with interest from the time it was taken by him.

3. When exceptions are taken before an Auditor they should specify definitely what is claimed not only for the information of the Auditor, but in order that the accountant may know what claims are made against him and what he has to meet.

4. A testator died in September, 1874, owning stock in The Pennsylvania and The Philadelphia & Reading Railroad companies which at that time and for some years thereafter paid dividends, and might have been sold at par, their appraised value. The executor did not sell until June, 1878 (when both stocks were greatly depreciated), selling at the same time some Pennsylvania R. R. stock which he owned individually. No necessity appeared to sell the stock to enable the accountant to pay debts of the estate:
   *Held*, that the accountant had exercised the ordinary judgment of a prudent man in making these sales, had not been guilty of supine negligence and could not therefore be surcharged with the loss arising from his error of judgment.

[Stewart's Appeal.]

5. A testator devised his house to his widow for life and bequeathed her an annuity which he charged on land devised to his son, the executor. The widow signified her intention to elect to take against the will, and all parties in interest united in an agreement by which the executor was to pay the widow a certain sum in consideration of which she released all claim to her dower or thirds in the estate. The agreement made no mention of the annuity. The executor having paid the widow the amount thus agreed upon and asked credit for the same in his account, a residuary legatee claimed that the accountant should be surcharged with the annuity charged upon the land devised to him, on the ground that, as the widow declined to accept the provisions of the will including the annuity, the latter constituted a trust for the benefit of the residuary legatees :

*Held*, that the money was paid by the agreement of all parties for the common benefit and was properly paid out of the residue ; and that as the widow did not take either at law or under the will the doctrine of Sandoe's Appeal, 15 P. F. S., 314, did not apply.

6. In the settlement of a complicated estate, extending through some nine years and involving great responsibility and trouble for the accountant, whose account showed debits amounting to $127,387.07 and credits amounting to $74,821.16, $4,000 was allowed as compensation to the accountant.

7. Where an accountant is charged with interest on moneys received by him he is entitled to interest upon the sums paid and especially to be allowed credit for interest upon claims of creditors when actually paid.

8. Where personal property is taken by the parties interested in an estate at the appraised valuation, the executor is entitled to a credit for the amount in his account and is not liable for interest thereon, for it never was money in his hands which could bear interest.

9. The compensation of executors and trustees is due them at the time when the services are performed.

10. A testator died September 21st, 1874, and letters testamentary were issued to his executor September 24th, 1874. A first account was filed June 21st, 1883, and was referred to an Auditor who re-stated the account up to January 1st, 1876, deducted commissions then earned and charged interest on the remainder. After 1876, the commissions were allowed in each year and interest was allowed thereon, being also charged on each item of money received by the accountant from one month after its receipt.

*Held*, that the Auditor correctly stated the account.

11. Callaghan *v.* Hall, 1 S. & R., 241, followed.

June 4th, 1885.   Before MERCUR, C. J., GORDON, TRUNKEY, STERRETT, GREEN and CLARK, JJ.   PAXSON, J., absent.

APPEAL from the Orphans' Court of *Juniata county :* Of July Term 1885, No. 61.

This was an appeal of John Stewart, executor of the will of Mary S. Pomeroy, and David McClay and Mary his wife (in her right) from the decree of the Orphans' Court of Juni-

ata county in the distribution of the estate of Joseph Pomeroy, deceased.

Joseph Pomeroy died September 21st, 1874, leaving a widow, Mary S. Pomeroy, who subsequently died on January 30th, 1881, and the following children : J. Nevin Pomeroy, Elizabeth N. Pomeroy, Eleanor M. Pomeroy, Samuel C. Pomeroy, and Mary Pomeroy who married David McClay. The decedent left a will, which was duly proved September 24th, 1874, and on the same day letters' testamentary were issued to J. Nevin Pomeroy, the executor therein named. On June 21st, 1883, the executor filed his account, which was referred to Jeremiah Lyons, Esq.

From his report, the following facts appeared :

1. It was urged before the Auditor that the accountant should be charged with $2,839.64, as the correct amount of inventory of merchandise in store and warehouse of decedent instead of $1,800, the appraised value thereof. As to this claim, the Auditor reported :

" In the inventory filed by the executor in the office of the Register of Wills, on the 26th day of October, A. D. 1874, the goods which are the subject of this exception are appraised at $1,800 as a whole, without any items or statement of the number, kind and quantity of the different articles appraised, and they were taken by the executor at that valuation, and were not sold by him as executor on account of the estate, either at public or private sale. The executor took them at the appraisement, and charged himself with the appraised value, and from that date conducted the store as his own, replenished it with new goods as the exigencies and demands of the trade in that locality seemed to him to demand. A minute and particular inventory of these goods was made, whether by the appraisers or by whom does not appear, and entered in a book in which the items or names, number and quantity of the articles are mentioned and set forth with the price or value of each. These when added up amounted to the sum of $2,839.64. For this sum it is contended on the part of the acceptants the accountant should be charged. Whether he should be so charged or not is the question raised by this exception. What is termed the specific appraisement was not filed until October 17th, 1883. How it came to be filed, your Auditor does not know. It was filed after the account of the executor was filed, after exceptions had been filed to the account, and before the final or last exceptions were filed. It was however admitted as evidence without objection. By whom it was made does not appear. It is not all in the handwriting of the same individual. It is not designated as an inventory of the personal estate of the testator,

although it contains an itemized statement of 'notes and interest,' ' notes available taken from the general list,' 'book accounts,' giving the names and amounts due by each individual, and also 'Inventory' of store goods minutely itemized, amount of grain at the several farms owned by the testator at the time of his decease, stock on the Mansion farm, Brubaker's tannery, Concord tannery, bank stock and railroad stock, from which the inventory originally filed is or seems to be made up. It is not signed by the appraisers, nor is there any evidence to show that it contains the valuation of the personal estate of the testator as deliberately made and ascertained by the appraisers. A careful examination of the list impresses the Auditor with the belief that it was a careful and minute description of the number and kind or quantity of goods in the store of Joseph Pomeroy at the cash price. And that when the appraisers had in this way been informed of the contents of the store, considering that many of the goods in stock were old and unsalable and of but little if any market value, appraised the whole stock at the round sum of $1,800 as its actual value. . . . . . That being the appraised value, it is the *prima facie* value, and in order to surcharge the executor with a greater sum there should be some evidence at least to show that they were in reality worth more than that sum. There is no evidence to satisfy your Auditor that such is the case. It is true, an executor should as a rule expose the goods of the estate at public sale. If he does not do so, he must account for them at the appraised value, and at a greater value if it is shown and proved that they were worth more, or that a greater price could have been realized therefor. But if he takes them at an appraisement fairly made, and there is no attempt at fraud, and none is alleged here, he should not be charged with more than the appraised value without satisfactory evidence that they were worth more than that sum."

2. It was claimed before the Auditor that "the accountant should be surcharged with the full value of the Juniata Valley Bank stock, as it was appraised."

The Juniata Valley Bank was not a corporation, but an ordinary partnership of which the decedent was a member. The amount paid in by the several partners was called stock, and was divided into shares of $100 each. The partners signed the articles of partnership containing *inter alia* the following:

"In case of the death of any of the stockholders during the term of this partnership, or if from any other cause it may become desirable to a majority of the stockholders to purchase the stock or interest in the association of any one of the stockholders, they shall have the right, at any time, to do so by

giving five days notice, verbal or written, from one of the officers of the bank to said stockholder or his legal representative, and at the expiration of said five days the officers of the bank shall ascertain and appraise the value of the stock or interest of said stockholder as shall appear upon the books of the bank, and shall immediately thereafter pay to said stockholder or his legal representative the value so ascertained, and upon the payment of which the officers of the bank shall take his receipt in full for all interest in the bank, release him from all liabilities of the bank, cancel his interest in the bank, and transfer the same to the bank or to other parties as directed by the majority of the stockholders." The Auditor found that "in the inventory there are 178 shares of Juniata Valley Bank stock appraised at $17,880. That was the number of shares owned by the testator at the time of his death, and the par value of each share was $100. It was appraised at its par value. That was the only value that the appraisers could well place upon it. It had no market value because it was never bought and sold in the market. This stock stood in the name of Joseph Pomeroy on the books of the bank until August 6th, A. D. 1877, at which time 83 shares of it were withdrawn at the sum of $83 per share, amounting to $6,889. There were 95 shares still in the name of the testator, and thus they stood until the 11th of December, A. D. 1877, when they were transferred to J. Nevin Pomeroy, his executor, who took them as his own, and charged himself with the value as previously ascertained, $83 per share, amounting to $7,885. In his account he charges himself with these shares under date of November 17th, 1877. Counsel for exceptants claim that he could not do this. That he should be charged with the appraised value of the stock, and it was argued that he should be charged with its present value, and with all the dividends which he received on it. Since the stock was transferred to accountant, he has received prior to the filing of his account dividends amounting to .    .    .    . ' $ 6,080 00
    "The stock was appraised on July 3d, 1883, at $126 per share, which was the last appraisement prior to filing the account, at which 95 shares would be    .    .    .    .    .    .    . $11,970 00

amounting to the sum of    .    .    .    . $18,050 00
received in dividends and value of the stock at its last appraisement.
    " The executor is charged with    .    . $ 7,885 00
    " Interest on this sum from November 7th, 1877,
to date, filing account August 14th, 1883,    $ 2,729 52

    " Total    .    .    .    .    .    .    . $10,614 52

[Stewart's Appeal.]

"·It will thus be shown that, if the position contended for by the exceptants be correct, the accountant would be surcharged with the difference between . . . . . . $18,050 00
and . . . . . . . . $10,614 52

or . . . . . . . . $ 7,435 48 "

The Auditor refused to surcharge the accountant as requested, distinguishing Lewis *v.* Ewing, 6 Harris, 313, cited in support of the surcharge on the ground that the decision there made concerned only stocks in an incorporated company, and did not affect the case of a partnership interest.

3. The testator died possessed of 218 shares of stock of the Pennsylvania Railroad Company, appraised at par, $50 per share. The letters testamentary were issued to the accountant September 24th, 1874, and the stock was sold by him on June 8th, 1878, for $30\frac{1}{8}$-$30\frac{1}{2}$, netting $6,565.50. At the same time he sold some of the same stock owned by himself individually at the same price. From June 8th, 1875, up to the date of sale, the accountant had received in dividends from the stock $2,561.50, making the total received on account thereof $9,127. The Auditor found that the highest and lowest quotations of this stock for the several years succeeding the testator's death were as follows:

"The following are admitted to have been the highest and lowest quotations of this stock in the market for the different years stated below:

| Years. | Highest. | Lowest. |
| --- | --- | --- |
| 1874 | $54\frac{7}{8}$ | $47\frac{5}{8}$ |
| 1875 | $56\frac{1}{4}$ | $47\frac{3}{4}$ |
| 1876 | $49\frac{3}{4}$ | $45\frac{5}{8}$ |
| 1877 | 49 | $24\frac{5}{8}$ |
| 1878 | $35\frac{1}{4}$ | 27 |
| 1879 | $51\frac{3}{8}$ | $32\frac{3}{8}$ |
| 1880 | $67\frac{1}{4}$ | 48 |
| 1881 | $70\frac{1}{8}$ | $59\frac{1}{2}$ |
| 1882 | $65\frac{1}{4}$ | $53\frac{7}{8}$ |
| 1883 | $64\frac{3}{8}$ | $56\frac{1}{8}$ |

" Had he sold this stock almost at any time within one year and three months after grant of letters testamentary, he could have received the appraised par value for it. And, in fact, during 1876, it was as high as $49\frac{3}{4}$ per share, so that during that year he could have realized with the dividends received par value, or the amount at which it was appraised. Had he

sold it at the par or appraised value, he would have realized
for the 218 shares    .    .    .    .    .    $10,900 00
And not charging him with interest to January
1st, 1876, but counting interest from that time to
June 8th, 1878, the time of sale, it would be       $    939 21

Whole amount    .    .    .    .    .    .    .    $11,839 21
He received    .    .    .    .    .    .    $ 9,127 00

Loss to the estate    .    .    .    .    .    $ 2,712 21 "
   The Auditor held that the accountant was guilty of such
wilful default and gross negligence that he should be charged
with the appraised value of the stock, and surcharged him ac-
cordingly.
   4. The testator owned also 108 shares of Philadelphia &
Reading Railroad Company appraised at par $50 per share.
This stock the accountant sold June 27th, 1878, netting $1,600.
Upon this stock he had received in dividends from June 8th,
1875, to January 24th, 1876 (when the company ceased to pay
dividends), $810, making the total received on account thereof
$2,410.   The Auditor found that the highest and lowest quota-
tions of this stock for the several years succeeding :

| Year. | Highest. | Lowest. |
|-------|----------|---------|
| 1874 | 59 | 53½ |
| 1875 | 57½ | 52 |
| 1876 | 55 | 18¼ |
| 1877 | 20¼ | 10 |
| 1878 | 19¾ | 11⅜ |
| 1879 | 37⅝ | 11½ |
| 1880 | 36¼ | 6¾ |
| 1881 | 37¼ | 25⅜ |
| 1882 | 33⅝ | 23⅛ |
| 1883 | 30½ | 23½ |

and added: " The stock as shown by the quotations above com-
manded a premium for over one year and three months after
the granting of letters testamentary to the accountant.   Had
he during this time sold it even at par it would have realized,
for the 108 shares,    .    .    .    .    .    .    $5,400 00
and interest on the same from January 1st, 1876, to
   date of sale, June 27th, 1876,    .    .    .    806 40

It would have yielded    .    .    .    .    .    $6,206 40
There was a loss to the estate of $3,796.40.   And for the rea-
sons given in disposing of above exception, the facts and cir-
cumstances being about the same, we sustain the exception and
charge the accountant with the appraised value of the Read-
ing Railroad stock, with interest from January 1st, 1876, and

strike from the debtor side of his account all charges for dividends received on the same."

5. Objection was made to the accountant's claim for credit for $10,000 paid to Mary S. Pomeroy, widow of decedent, in accordance with an agreement of the parties interested under the will.

The testator devised to his wife his mansion house for life, and an annuity of $600 per annum "to be charged on lands devised to his children," said devise and legacy to be in lieu of all dower or thirds of testator's estate.   To J. Nevin Pomeroy, the executor, the testator devised certain property, "the said J. Nevin Pomeroy to pay out of the above named mansion property the sum of six hundred dollars to my wife Mary, during her natural life."   The testator then devised and bequeathed other property to his other children, and all the rest and residue of his estate to all his children equally to be divided between them.   The widow being dissatisfied with the testamentary provision in her favor signified her intention to elect to take against the will; to avoid which all the children and legatees of the decedent, including the executor, joined with her in an agreement under seal duly acknowledged and recorded, providing as follows : ".That the said Mary S. Pomeroy shall receive from the estate of said Joseph Pomeroy, deceased, the sum of ten thousand dollars absolutely, to be paid to her on or before the first day of April, A. D. one thousand eight hundred and seventy-six, by said executor, and she shall also receive the one sixth of the residue of the personal estate of said deceased absolutely, which will remain after the payment of the aforesaid ten thousand dollars, and after the payment of all the legacies and bequests made and given in said will, (except the bequests to Mrs. Mary Pomeroy in said will which are hereby relinquished,) and also after the payment of the debts of said deceased, and the expenses of settling said personal estate, and also after the payment of the following moneys, and requested by Joseph Pomeroy to be paid from his estate, some of which requests were verbal and others written, but not included in his proven will, viz. . . . . .

"The said Mrs. Mary S. Pomeroy, widow aforesaid, shall also receive during the term of her natural life the one sixth part of the interest of the net moneys realized from the sale of the real estate of. said deceased not devised by said will, and until such real estate shall be sold she shall receive the one sixth of the net amount received as rental for the same upon the sale of the products raised from said real estate.   The said above mentioned moneys to be paid by said J. Nevin Pomeroy, executor aforesaid, from the estate of said deceased. agreeably to the foregoing provisions.   And in consideration of the agree-

ment aforesaid the said Mrs: Mary S. Pomeroy, widow aforesaid, doth hereby relinquish and waive her right to take her dower and thirds in the estate of said deceased, and doth release said estate from such dower and thirds, and also doth hereby release the estate of the said deceased and the said executor and devisees from the payment of the legacies and bequests and devises made to her in said will, and from all the provisions therein made for her, and doth relinquish the same, and in lieu thereof doth accept the payments heretofore stipulated and agreed to be made to her in this agreement, from the estate of said deceased."

The accountant paid the sum of $10,000 to the widow on April 1st, 1876, and asked credit for the same in his account. The executors of Mrs. Mary S. Pomeroy and Mrs Mary McClay excepted to this credit and claimed that the accountant was entitled only to a credit " of the amount in excess of the annuity of $600 and interest thereon, payable to Mary S. Pomeroy to her death from the death of Joseph Pomeroy, and by said will charged upon the real estate devised to said J. Nevin Pomeroy, the accountant." The Auditor overruled this exception, saying, " The agreement was made to effect an amicable family settlement and as such should be upheld and sustained if possible to do so, such arrangements being favored by the law."

6. The accountant claimed as compensation for his services $4,435.73, which was objected to as exorbitant and excessive.

Upon this the Auditor reported as follows:

" The account shows that the amount of personal estate received by the executor and with which he charged himself, amounts to the sum of                                    $100,595 04
And he paid out                                        . 63,046 36
including the sum of $4,435.73, which he claimed as compensation for his time, trouble and responsibility, which is claimed to be excessive.

" The accountant took the store at its appraised value, $1,800 00
Also 95 shares Juniata Valley Bank                      7,885 00
Personal property to the amount of                       1,004 73

    Total                                        $10,689 73

" On this sum he should be allowed no commissions. Had he sold it at public sale it might have realized more. He sold considerable real estate, on which less than five per cent. is usually allowed. He delayed the settlement of the estate unnecessarily. He paid interest on the debts and carried them instead of paying them off when he had funds in his hands to pay them, thus increasing the items of credit in his account. He did not file an account till almost nine years after the

grant of letters testamentary, and then when cited to do so. His account when filed was not as explicit and clear as it might and should have been. And under all the circumstances of the case your Auditor thinks that four thousand dollars would be a just and fair compensation, and reduces his claim for time, trouble and responsibility to that amount."

7. The fifteenth exception to the account was in these words: "The accountant has mismanaged the estate in general and in the manner of payment of debts. Instead of paying debts he paid interest and carried the debts, and he should not be allowed interest on any of the following payments for interest on notes and debts of the testator, to wit:" Then followed a list of some 71 payments of interest objected to; ranging in date from January 7th, 1875, to November 14th, 1882, and in total amount to $3,076.72. The Auditor reported:

" Ordinarily when an executor or administrator is charged with interest on the debit side of his account he should be allowed interest on the credit also. And although in the case of Callaghan .v. Hall, 1 Serg. & Rawle, 241, the Supreme Court say that, ' an administrator who suffers a just debt to remain unpaid, while he has assets to discharge it, must pay the damages from his own pocket.' In this case there was more than ordinary misconduct. The administrator refused to pay until sued and costs were added to the interest. His conduct was wholly inexcusable.

" But in the case now before the Auditor there is no such element. The delay in payment seems to have been acquiesced in. The debts had been created by the testator and the creditors were no doubt willing to wait. There is no evidence that they urged payment of their notes. And, although the account would show large balances in the hands of the accountant, it is shown by his distribution account, filed at the same time that his administration account was filed, that he had paid considerable sums to the residuary legatees. And as he has been charged with interest on the balance in his hands, January 1st, 1876, and also on each item of cash afterward received after thirty days from the date of the receipt, as shown by his account, your Auditor thinks he should be allowed interest on these payments. The exception is therefore overruled."

The Auditor re-stated the account accordingly. He included in the debit side a charge of $1,515.13, the appraised value of certain personalty taken by the heirs at the appraisement and deducted this amount from the balance in accountant's hand January 1st, 1876, $13,192.45, leaving $11,677.32, and deducting commissions earned at that date, $1,800, charged

interest on the remainder, $9,877.32, from January 10th, 1876, to September 10th, 1883, amounting to $4,543.56. In stating the credit side of the account the Auditor allowed credit in January of each year, from 1877 to 1881, for commissions earned and for interest on the several sums to date, September, 1883. Interest was charged on both sides of the account on all items paid and received since January 1st, 1876.

The accountant filed exceptions to the surcharges for losses on the sale of the Pennsylvania and Philadelphia and Reading R. R. Stock, and the executor of the widow of the testator and his daughter, Mary McClay, filed exceptions to the refusal of the Auditor to sustain their other exception to the account as above stated, and also to the account as re-stated by the Auditor therein, viz.:

8. The Auditor in calculating the interest with which he charged the accountant deducted the sum of $1,515.13, amount of personalty taken by the heir at appraised value before calculating the interest, thus making a difference in the interest charge of $696.90 and

9. The Auditor allowed to accountant interest on his commission and compensation amounting to $1,612.

The Court, BARNETT, P. J., sustained the exceptions filed by the accountant to the surcharge, with the appraised value of the railroad stocks, and dismissed the exceptions filed by the widow and daughter of the testator.

Whereupon John Stewart, executor of the will of Mary S. Pomeroy, the widow, and David McClay, and Mary his wife (in her right), the daughter of the testator, took this appeal, assigning for error the decree of the court, overruling their exceptions to the Auditor's report, and re-stated account as above set out severally.

*Ezra D. Parker* (with whom was *John Stewart*), for appellants.—1. The "specific" inventory was really part of the general inventory filed. It was made by the appraisers selected by the executor and was offered in evidence before the Auditor. It was therefore evidence against the accountant who was really purchasing these goods from himself at a discount from their real value. He is responsible for the full value of the goods: Reiff's Appeal, 2 Barr, 256; Lothrop *v.* Wightman, 5 Wright, 302; Nicely's Estate, 11 Luz. R., 53.

2. "The accountant should be charged with the appraised and full value of the Juniata Valley Bank stock." He cannot thus sell to himself the goods of his testator; the transfer vests no title in him, and he is liable to the estate for their value: Lewis *v.* Ewing, 6 Harris, 313; Lothrop *v.* Wightman,

*supra*; Reed's Appeal, 1 Norris, 428. It is a rule of public policy: Webb *v.* Dietrich, 7 W. & S., 401; Chorpenning's Appeal, 8 Casey, 315; Grimm's Appeal, 9 Out., 375; Aultman's Appeal, 2 Out., 505; Gilbert's Appeal, 28 P. F. S., 266.

3 and 4. The executor is liable for the loss on the railroad stocks, because he might have realized the full value and did not sell until the value had depreciated: Johnston's Estate, 9 W. & S., 107; Charlton's Appeal, 10 Casey, 473. He was guilty of supine negligence: Dundas's Appeal, 14 P. F. S., 325; Springer's Estate, 1 P. F. S., 344.

5. Where a widow elects not to take under a will, her substituted devises and bequests are a trust in her for the benefit of the disappointed claimants to the amount of their interest therein: Sandoe's Appeal, 15 P. F. S., 314; Gallagher's Appeal, 6 Norris, 200.

6. The accountant's claim for services is exorbitant. There was no vendue of the goods of the estate. The leather tanned out at decedent's tannery was all sold by commission merchants. The amount of the estate was large and the accountant had little trouble: Pusey *v.* Clemson, 9 S. & R., 209; Walker's Estate, 9 Id., 223; Stevenson's Estate, 4 Wharton, 98; Montgomery's Appeal, 5 Norris, 230; Norris' Appeal, 21 P. F. S., 106.

7. The accountant, in suffering the testator's debts to remain and paying interest on the same, having funds to pay them, was guilty of a devastavit. He should not be allowed interest on his payments of interest: Callaghan *v.* Hall, 1 S. & R., 241. There was no acquiescence by the appellants.

8. The accountant has here blended administration and distribution. This is erroneous: Yundt's Estate, 6 Barr, 35. The property was not taken by all the parties or in equal shares, so the result is a loss to the appellant of one third of the $1,515.13 with interest, amounting to $2,112.03, or $704.01.

9. The accountant was not entitled to interest on his com-
The executor should ask for this credit in the proper place, i. e., the distribution account.
missions. He thus virtually receives $1,612 in addition: Armstrong's Estate, 6 Watts, 236.

*Louis E. Atkinson* and *George Jacobs* (with whom was *B. F. Junkin*), for appellee.

Mr. Justice GREEN delivered the opinion of the court October 15th, 1885.

*First assignment.*—There is no doubt that an executor who retains the goods of his testator is liable for their value, and it

was quite open to the exceptants in this case to give evidence of the actual value of the store goods kept by the accountant and have him charged therewith. But that course was not adopted. In the regular inventory of the estate, sworn to and signed by the appraisers, and filed in October, 1874, shortly after the testator's death, the store goods were appraised at $1,800. This is *prima facie* evidence of their value, and is the sum charged in the account. Another paper was given in evidence, which was filed October 17th, 1883. It is not sworn to and not signed, but appears to be a schedule or list of the personal assets of the testator in detail, with valuations marked opposite each item. No verbal explanatory evidence was given showing what these valuations represented. An individuated and itemized list of store goods appears in this paper not footed up, but the figures of which, being added together, amount to $2,839.60. It is very certain that this sum does not represent the value at which the store goods were appraised, because, by the sworn and signed inventory, they were appraised at $1,800. If this was too low an appraisement, it was entirely competent to prove it; but that not having been done, there is no basis upon which we can find that the Auditor and court below were in error in finding the sum of $1,800 to be the proper value of these goods.

The Auditor finds as a fact the store was an old one, kept for many years by the testator, in which were many goods which had gone out of date and had greatly depreciated in value, and this appears to be a sufficient reason for holding that $1,800 was an adequate valuation, even if the ordinary retail prices had been as the figures in the specific inventory indicated. The first assignment is not sustained.

*Second assignment.*—The accountant charged himself, on the 17th of November, 1877, with the sum of $7,885, being the valuation of 95 shares of Juniata Valley Bank stock at $83 per share. The facts were that the testator held 178 shares of this stock at the time of his death, which were appraised at $17,880, being the par value of the stock.

The institution in which these shares were held was not a corporation but a partnership. The articles of partnership contained a provision authorizing a majority of the stockholders, upon the death of any member, to purchase the stock or interest of the deceased member at a valuation to be fixed in the manner pointed out in the articles. This valuation was made and the price fixed at $83 per share. The bank purchased 83 shares at that price, and the accountant charged himself with that value for those shares. This left 95 shares still in the hands of the accountant, and these the cashier urged him to take at the same valuation. He finally consented

to do so, and had them transferred to himself at the price of $83 per share. The Auditor finds that this was the full value of the stock at that time, and there is no doubt that the transaction was made in perfect good faith by the accountant without a suspicion of its illegality. He probably failed to take the advice of counsel on the subject, and that was his misfortune. The rule of liability in such cases does not depend in the slightest degree upon the good or bad faith of the trustee. The transaction is voidable at the instance of the *cestui que trust*, on the ground that it is prohibited by public policy. A trustee cannot thus deal with the trust estate. It would be a waste of time to recur to the authorities. There is no more familiar doctrine in the law than this. The Auditor thought that Lewis *v.* Ewing, 6 Harr., 313, was not applicable, because that case related to a transfer of stocks, and this was a partnership interest, which the surviving partners had a contract right to buy. This would have been very well, and would have controlled the question, if the remaining partners had exercised their right of purchase, and taken all of the stock. But they took a part only, and the rest of the shares remained with the accountant. They were not his and could not become his by being transferred to his name. They belonged to the estate the same after as before the transfer. The exceptants ask to have the accountant charged with the full appraised value of the shares instead of the price at which he took them. They have a right to make this demand, and their exceptions and assignment of error on this subject are sustained. The accountant must be surcharged, but we have some difficulty in determining in what way and with what amounts, owing to the language of the exceptions taken before the Auditor, and of the assignment of error. There were two exceptions before the Auditor. One was the 3d specific exception, in the following words: "III. He should be charged with the full value of Juniata Valley Bank stock as it was appraised." The other was the 8th specific exception, as follows: "VIII. He should be charged with the appraised and full value of the Juniata Valley Bank stock." As we understand these exceptions, they contain no demand to charge the accountant with any other than the full appraised value of the stock, which was $100 per share, and of course it would follow that the demand would relate back to the time of the appropriation of the stock by the accountant, to wit, Nov. 17th, 1877, and he should be charged with interest on the amount from that time. Neither of these exceptions asked that he should be charged with dividends after the stock was taken, nor does the second assignment of error. The exceptions and the assignment treat the stock as having been appropriated by the accountant, and

ask to charge him with its value. Of course, this regards 'the accountant as owner and simply demands payment of 'the proper price. If the exceptants claimed the stock as still belonging to the estate, they should have asked to charge the accountant with all dividends received, and should have required him either to divide the shares among the legatees or sell them at public sale. Failing to do either of these things, they could have petitioned the court for an order to compel him to sell the shares, or could have asked the Auditor, by a proper exception, to surcharge him with the value of the stock as it was at the time of the audit or at some other fixed time. But they did neither of these things. The second exception in the Orphans' Court to the report of the Auditor does claim that the " Auditor erred in overruling the third exception and in not charging the accountant with the full and actual and present value of 95 shares of Juniata Valley Bank stock and the dividends thereon, and in overruling the eighth exception so far as it relates to Juniata Valley Bank stock, which exceptions are as follows: " III. He should be charged with the full value of Juniata Valley Bank stock as it was appraised." " VIII. He should be charged with the appraised and full value of the Juniata Valley Bank stock."

Of course it was not error for the Auditor to refuse to do that which he was not asked to do. As we understand these exceptions and the assignment of error, they constitute a demand by the exceptants that the accountant shall be charged with the appraised value of the stock at the time it was taken. That value was $100 per share, and the surcharge will therefore be $1,615, being $17 per share on 95 shares, with interest thereon from Nov. 17th, 1877. Where exceptions are taken before an Auditor they should specify definitely what is claimed, not only for the information of the Auditor, but in order that the accountant may know what claims are made against him and what he has to meet. In this case, not even the printed argument asks any surcharge of dividends received nor any charge of the value of the stock other than is stated in the exceptions before the Auditor.

*Third and Fourth assignments.*—We see no reason for surcharging the accountant with the loss sustained in the sale of the Pennsylvania and Reading Railroad stock. They were securities which the testator had himself purchased and held up to the time of his death. They were both dividend-paying securities and so continued for several years after the testator's death. There was no necessity for selling them either to pay debts or for any other purpose. The accountant simply held them as the testator held them while he lived. When he sold them he sold his own similar securities also for the same prices

[Stewart's Appeal.]

and for the same reason. He was fearful they would depreciate still further. It was of course utterly impossible for him or any other person to know what the future course of the market would be. If they had gone still lower, he might have been still more censured and incurred the possibility of still greater loss. For aught that we can see he exercised the ordinary judgment of an ordinarily prudent person in making these sales, and in this there is nothing of supine negligence which is required in order to charge a trustee in such cases. In Neff's Appeal, 7 P. F. S., on p. 96, we said: "All that a court of equity requires from trustees is common skill, common prudence and common caution. Executors, administrators or guardians are not liable beyond what they actually receive unless in case of gross negligence, for when they act as others do with their own goods and with good faith, and are not guilty of gross negligence, they are not liable." The foregoing is very familiar doctrine and supported by numerous authorities. Hanbest's Appeal, 11 Nor., 482, was an application of the same doctrine to the case of the continuance of a bank deposit of over $40,000, and its loss by the subsequent failure of the bankers, when it might have been saved by simply transferring it to some solvent bank, but we held that the accountant was not liable for the loss. The third and fourth assignments are not sustained.

*Fifth assignment.* The executor of the widow disclaims all benefit of this assignment, and the daughter, Mrs. McClay, withdraws her plea of infancy to the written agreement, by which all the legatees agreed that the executor should pay $10,000 to the widow, who in consideration thereof released all claim to her dower and thirds of the estate. None of the other legatees asked to surcharge the accountant with the annuity which was charged upon the land devised to him for the benefit of the widow. The question then stands in this way: The widow and all the legatees and devisees by a contract in writing agreed that the widow should decline to take against the will and release all claims of dower and thirds in and to the real and personal estate of the testator, and, in consideration thereof, the executor should pay to the widow ten thousand dollars, and one sixth part of the residue of the personal estate, and one sixth part of the interest of the proceeds of the sale of the real estate during her life.

It would be very strange, after such an agreement as this, if the executor who paid the $10,000 to the widow in pursuance of its terms, and on the faith of its provisions, by the express authority of all the parties interested, including this exceptant, Mrs. McClay, should be denied credit for the payment. The money was paid for the common benefit of all,

and of course is paid out of the residue of the estate, and simply diminishes the amount of the residue by that sum. As the residue is given to all the children in equal sums, the loss thus sustained, if there is any loss, is common to all. All are disappointed in this respect alike, and it is not necessary to call upon a devisee or legatee, who has advantages by the release of dower and thirds, to make good the loss of some other legatee or devisee, who is injured by the widow's election to take at law operating to diminish, or burden, his legacy or devise. The widow in this case does not take at law. She simply releases all her claims both at law and under the will for a special sum of money payable out of nobody's share, but out of the general residue. The cases of Sandoe's Appeal, 15 P. F. S., 314, and Gallagher's Appeal, 6 Norr., 200, are not analogous. In both of them the widow did elect to take at law, and this claim worked special injury to certain devisees whose devises were thereby burdened and rendered unequal with the others. Equality of distribution required that the benefits intended for the wife should be sequestered to secure compensation to those who were disappointed by her election. But there is nothing of that kind in the present case. It is true that the accountant as a devisee is relieved of paying for a few years an annuity to the widow. But that is no injury to the others and it is simply a relief to him. If the parties had desired that he should pay this annual sum or its equivalent to them, they should have so stipulated in the agreement. There is no provision of that kind in the contract, and the facts are not such as to warrant a court in sequestrating the annuity for the benefit of the other parties. The fifth assignment is not sustained.

*Sixth assignment.* The accountant's compensation was fixed at $4,000 by the auditor and court below. The debtor side of the account as determined by the final decree of the court below amounts to $127,387.07, and the credit side to $74,821.16.

The estate was a very complicated one, the settlement of it extended through a number of years, and is not yet closed, the account itself is of extraordinary length, containing a vast number of items, very great responsibility was cast upon the accountant, and the compensation allowed is but a little over three per cent. We do not think this at all excessive, and the sixth assignment is therefore not sustained.

*Seventh assignment.* As the accountant is charged with interest on all the moneys received by him, he is undoubtedly entitled to interest on the sums paid, and especially to have credit for sums of interest upon claims of creditors when actually paid. The assignment is not sustained.

*Eighth assignment.* As the accountant was specifically

charged with the item of $1,515.13 for articles of personal property taken by the heirs, he was certainly entitled to have credit for it because of his delivery of the goods to those who received them. We cannot imagine any principle upon which he should pay interest on such an item. It never was money in his hands and of course could not bear interest. It was delivered to the legatees and for that reason, if for no other, no interest should be charged on the value of the goods. It was possible for the legatees to make interest on this sum by selling the goods. But in no conceivable event could the accountant do so, as he had neither the goods nor their value.

*Ninth assignment.* The compensation of executors and trustees is due at the time the services are performed : Parker's Est., 14 P. F. S., 307; Adams' Appeal, 11 Wr., 94; Callaghan *v.* Hall, 1 S. & R., 241. In the last of these cases we held that the commissions must be deducted from the balance before interest is computed. In the present case the Auditor stated the account up to January 1st, 1876, deducted the commissions then earned from the balance then in hand, and charged interest on the remaining sum to September 1st, 1883. This was in exact accordance with the decision in Callaghan *v.* Hall, *supra.* After 1876 the commissions were allowed for each year, and as interest was charged on each item of money received from one month after its receipt, of course the accountant was entitled to credit for interest on the commissions earned during the year. The eighth and ninth assignments are not sustained.

Now, October 15th, 1885, the decree of the court below is affirmed in all respects except as to the Juniata Valley Bank stock, and as to that it is adjudged and decreed that the accountant be surcharged with the sum of $1,615 and interest thereon from November 17th, 1877, and to that extent the decree of the court below is reversed at the cost of the appellee.