# In re Estate of William Semple, deceased.    Appeal of Marion Stevens.

*Executors and administrators—Surcharge—Sale of personal property—Responsibility of executors.*

So long as executors manage the estate in accordance with the ideas which the decedent himself entertained of it, and do nothing but what there is reason to believe he would have approved, it seems they are not responsible for losses to legatees.

Between an executor and legatees, a case is to be decided upon a more liberal view of the discretion and power of an executor than it would be as against creditors.

All that a court of equity requires from trustees is common skill, common prudence and common caution.    Executors, administrators or guardians are not liable beyond what they actually receive unless in case of gross negligence, for when they act as others do with their own goods, in good faith, they are not liable.

Testator before his death verbally requested his widow whom he made his executrix to sell his stock of goods.    The goods were old, and the business for several years had been in bad condition, and was heavily involved in debt.    Testator had made repeated efforts to sell the stock, but

had not succeeded.   After testator's death the widow continued the busi-
ness for about three months, and then with the consent of all the children
who were legatees under the will she sold the goods for $30,000, which
was $48,000 less than the inventory.

There was no evidence that any responsible person or persons would
have paid the inventory price for them, and the clear preponderance of
the testimony of the best informed witnesses was that the price received
was a fair and reasonable one.   It appeared that through the prudent and
skilful management of the executrix the whole estate, after a period of
eight years, was relieved of a debt of nearly one quarter of a million of
dollars.   One of the legatees who had assented to the sale afterwards as-
signed his interest in the estate and his assignee asked to have the execu-
trix surcharged.   *Held*, that under the facts of the case, the orphans' court
was in error in surcharging the executrix with the difference between the
price of the goods as inventoried and the price for which they were ac-
tually sold.

The inventory of a decedent's goods is not conclusive as to value, but
only prima facie evidence, and is liable to be questioned by any party in
interest, either as being too low or too high.

*Orphans' court—Equity practice—Reopening case—Evidence.*

As the orphans' court is governed by equity principles and practice, and
as one of the familiar doctrines in chancery practice is that the door of
equity is never closed, the orphans' court should, after having surcharged
an accountant for an alleged wrongful sale of goods, reopen the case for
the introduction of new testimony which tends strongly to show that the
price received for the goods was fair and reasonable.

*Executors and administrators—Commissions.*

Where the actual disbursements of an estate amount to about $350,000,
and the actual transactions to about $2,000,000, and the executrix through
careful and prudent management and successful litigation during a period
of eight years clears off a debt of a quarter of a million of dollars, and
hands over to those entitled to it an estate which was originally bankrupt,
free of debt, and with its whole value unimpaired, the executrix is entitled
to a compensation of five per cent upon the actual amount disbursed.

*Wills—Annuities—Executors and administrators.*

Where a widow is made sole executrix of a will " with plenary powers
to execute and carry out its provisions," and the whole estate is given to
her subject to the payment of two annuities out of testator's estate " yearly,
in quarterly payments," the executrix may pay the annuities in quarterly
payments if the money is not needed for creditors, and may take credit for
such payments at the date of each payment, in her account as executrix.

*Will—Charge of legacies.*

Testator gave all his real estate and the income of all his personal estate
to his widow so long as she remained his widow, and no longer, " subject
to the following charges: I give and bequeath to each of my two daugh-
ters [naming them] so long as my widow remains unmarried, the sum of

one thousand dollars payable out of my estate yearly, in quarterly payments." *Held*, that the annuities were not a personal charge upon the widow, but were payable out of the testator's estate.

*Executors and administrators—Expenses of conducting business.*

Where an executrix was compelled for a period of eight years to maintain an independent office by reason of an immense number of transactions of many different kinds relating to the settlement of the estate, she is entitled to credit for office rent, carpets and general expenses in maintaining the office.

Where an executrix is compelled to operate a store for a few months before the stock can be sold, she will not be surcharged for ice and other items furnished to the store.

Argued Nov. 7, 1898. Appeals, Nos. 126 and 127, Oct. T., 1898, by Marion Stevens, formerly Marion Semple, from decrees of O. C. Allegheny Co., April T., 1897, No. 60 and Nov. T., 1897, No. 59, overruling exceptions to adjudication. Before GREEN, McCOLLUM, MITCHELL, DEAN and FELL, JJ. Reversed.

Exceptions to adjudication.

The facts are fully stated in the opinion of the Supreme Court.

*Errors assigned* were the various surcharges mentioned in the opinion of the Supreme Court.

*D. T. Watson*, with him *Johns McCleave*, for appellant.—It was a disregard of the weight of evidence in the case, which fairly indicated that $30,000 in what was equivalent to cash was a fair value for the stock of goods then in the store: Powel's Assigned Est., 163 Pa. 365.

The sale was an advantageous one, even if it was a partial sacrifice of the goods, and was justified under the circumstances of the case: Stewart's App., 110 Pa. 425; Bowker's App., 5 W. N. C. 493; Bruner's App., 57 Pa. 46; Williamson's Est., 7 W. N. C. 82; Kalbfell's Est., 184 Pa. 25.

The court erred in surcharging the accountant with the sum of $16,044.44, being the amount of the annuities paid Mrs. Spiegel and Mrs. Gardner under the will of the decedent: Randall v. Tuchin, 6 Taunt. 410 ; Broom's Legal Maxims, p. 569 , Potter's Dwarries on Statutes, p. 197 ; Platt v. R. R., 99 U. S.

53; Com. v. Alger, 7 Cush. (Mass.) 53; People v. Burns, 5 Mich. 114; Gates v. Salmon, 35 Cal. 576; Market Co. v. Hoffman, 101 U. S. 112; City of Pittsburg v. Kalchthaler, 114 Pa. 552.

*J. M. Stoner*, with him *George Hadfield*, for appellee, cited as to the payment of the annuities: Quain's App., 22 Pa. 512; Denis's Est., 169 Pa. 494; Dickerman v. Eddinger, 168 Pa. 243.

OPINION BY MR. JUSTICE GREEN, January 3, 1899:

The appellant was the widow of the decedent and the sole executrix of his will. She was also the devisee and legatee of all his real and personal estate during her life or widowhood. On the adjudication of her account as executrix she was surcharged by the court below with the sum of $48,030, being the difference between the price at which she sold the stock of store goods belonging to the estate of the testator, and the amount of the inventory of the goods. The correctness of this surcharge is the question of chief consequence in the present appeal. There are some other matters of dispute but this is the chief one. The appellant's husband was a dry goods merchant living in the city of Allegheny at the time of his death. He had conducted a large business some years before his death, employing as many as 200 clerks at times, but before his death the business had become much curtailed, and only about forty to fifty clerks were employed some time before, and at the time of, his death. An inventory of his stock was made after his death, the amount of which was $78,030. In about three months after the death of the testator the executrix sold the whole of the stock for a lump sum of $30,000, and the court below surcharged her with the difference between this sum and the amount of the inventory, to wit: $48,030, holding that she had not overcome the prima facie character of the inventory. After a very careful and attentive reading and study of the opinion of the orphans' court and of the testimony taken on both sides and of the arguments of counsel on both sides, we find ourselves entirely unable to agree either with the conclusions or the reasons in support of them contained in the opinion of the learned court below. The circumstances in which it is proper to surcharge an accountant have been well defined in a number of the

decisions of this Court, and there ought not to be any difficulty in applying the principles controlling the subject to the facts of any given case. The particular ground of surcharge in this case was that the executrix sold the stock of goods in question for less than its fair value, and the court below held her responsible, that is liable to pay the full inventory price of the goods, $78,030. There was not a particle of testimony in the case to prove that any responsible person or persons would have paid that much for them, and the appellant claims that she sold them for as much as could be got for them. A very few citations from our own decisions will suffice to exhibit the state of the law on this subject. In McNair's Appeal, 4 Rawle, 148, it was said: "So long as executors manage the estate in accordance with the ideas which the decedent himself entertained of it, and do nothing but what there is reason to believe he would have approved, it seems they are not responsible for losses to legatees. Between an executor and legatees, a case is to be decided upon a more liberal view of the discretion and power of the executor than as against creditors."

The appellant alleged that in selling the stock of goods as she did she was acting in pursuance of the positive directions of her husband. She testified that at a family conference the night after the funeral, all the children being present and the question being what was to be done with the business, the following took place: "Well, they all thought it would be a good thing to have the store opened and run permanently, and I was called in and we had a counsel. They told me what they thought it would be the best to do, and I objected at once, because my husband before he died told me to get rid of the store. He said, 'Now you had better get rid of the store and take the first opportunity you can get.' That was one of the instructions he gave me a few days before he died." There was no contradiction of this testimony. They all agreed that the store should be opened and run for a time, and this was done for about three months, all concurring, including James Semple, the assignor of the exceptant.

In Keller's Appeal, 8 Pa. 288, Justice COULTER, delivering the opinion, said: "A court of chancery always deals with great tenderness towards a trustee acting in good faith. . . . The most stringent of our own cases require that the administrator

should be guilty of gross negligence in order to charge him."
Lord HARDWICK says, in Knight v. Earl of Plimouth, 3 Atk.
480, "If there is nothing wilful in the conduct of the trustee,
no mala fides, the court will always favor him." In Stewart's
Appeal, 110 Pa. 425, we said: "For aught that we can see he
exercised the ordinary judgment of an ordinarily prudent per-
son in making these sales, and in this there is nothing of supine
negligence which is required in order to charge a trustee in
such cases. In Neff's Appeal, 7 P. F. S. on page 96, we said,
'All that a court of equity requires from trustees is common
skill, common prudence and common caution. Executors, ad-
ministrators or guardians are not liable beyond what they actu-
ally receive unless in case of gross negligence, for when they
act as others do with their own goods, in good faith, and they
are not guilty of gross negligence, they are not liable.' "

It is not necessary to enlarge the citations; there is no kind
of dispute that the law is as stated in the foregoing decisions.

The opinion of the learned court below does not contain the
slightest reference to the decisions of this Court on the liabil-
ity of accountants to surcharge, nor is any effort made to show
that the accountant was guilty of supine negligence in making
the sale of goods. The conclusion of the court is thus expressed,
"In view of all the circumstances, the prima facie character of
the inventory has not been overcome; and the executrix must
therefore be surcharged with the loss which resulted from her
negligence." We do not understand that this is the proper
test to determine the liability of an executrix to be surcharged
for loss on a sale of goods, and if we did so understand the law,
we are unable to agree with the learned judge in his conclusion
that the accountant was guilty of supine negligence, or of any
negligence in making the sale in question. We will proceed
to set forth our reasons for differing with the learned court be-
low in the conclusion reached upon this subject.

In considering a question of this kind it is necessary to take
into account the situation and condition of the estate, the char-
acter and quality of the goods sold, the opinions of witnesses
best qualified to judge, the wishes and desires of the persons
interested in the property and in the estate, and the good or
bad faith of the accountant in making the sale.

It was distinctly proved, and not at all contradicted, that the

estate of William Semple was at the time of his death indebted
to the amount of $247,644.11.  Of this total sum there was due
upon promissory notes, maturing from day to day, and all within
four months, $147,089.93.  There were unpaid bills, taxes, etc.,
to the amount of $27,091.79, all overdue, and in bonds and
mortgages $65,000.  While it is true that the latter items might
remain for a time without disturbance on their account, it is
also true that the other items of debit were imminent, were
constantly maturing, were naturally pressing upon the resources
of the estate, and might, at the option of the creditors, be urged
for payment at the end of one year from the testator's death.
As the stock of goods represented a mercantile business, which
is always subject to the vicissitudes and fluctuations of trade,
and as, in order to make a fair sale of the property as a mer-
cantile stock in a going business, it was of the greatest impor-
tance that the credit of the business should be maintained.  It
was wise policy therefore to keep the business going until a
fair sale could be made.  It was consequently necessary to keep
up the supply of salable goods by such fresh purchases as were
essential to that end.  At the same time it was also necessary
to preserve the outstanding paper from dishonor and avoid a
condition of patent insolvency.  But this could not be done
without ready money.  It was not desirable to sell the stock
securities of the estate, as they gave promise of enhancement
of value in the future, and in these circumstances an early sale
of the stock of merchandise became an urgent necessity.  The
testator had made repeated efforts to sell the stock in his life-
time, and within a year before his death he had offered it for
sale at $45,000, but the offer was refused.  To this William
Semple, his son, and one of the legatees of the estate, testified,
and he said also that the stock was about the same at that time
as at his father's death.  The same witness testified also as fol-
lows : " For the last four or five years before my father died he
was trying to get out of the dry goods business, but the stock
of goods was old and to attempt to sell it there in the city meant
to have sold the staple goods and to have the balance on his
hands to carry along for perhaps a year or so.  And in addition
to that he had a large building which he didn't know what to
do with.  And he thought he might get an opportunity to trade
his stock of goods off to better advantage for Western lands in

some way. And he was carrying along that business simply from hand to mouth—filling up what goods he sold out. . . . He got a man who was connected with R. H. White & Co. from Boston to whom he tried to sell the store, but the man didn't care about taking the stock of goods. . . . He didn't want the old stock. Father had been anxious to sell the stock of goods for three or four years and get out of the business." After continued efforts to sell had been made for about three months an opportunity was offered to make a sale of the stock. A man named Neuhause, who was in the employ of a firm of auctioneers and commission merchants in New York city, was sent by his firm to Allegheny city to examine the stock of goods for a customer of theirs who was disposed to buy it. He was examined as a witness at much length and testified in detail as to what he did in the way of investigating and appraising the stock, and he finally reported to his employers that they could afford to advance $28,000 on the stock to their customers, and an offer of $30,000 was then made to the accountant by the firm of Sweinberg & Davidson, of New York city. The negotiation for the sale was made by the two sons, William and Francis Semple, who had been managing the business for several years before their father's death, and continued to do so after his death. The whole family agreed to the sale. There was no objection to it then or afterwards by any of the family. James M. Semple, one of the sons who in 1895 assigned his interest in the estate to Cartwright, the only exceptant to the account, was then the owner of his interest, and he as one of the family assented to the sale. William Semple, the testator, died in June, 1889, and the sale was made about three months after that, while James M. Semple was the full owner of his own interest in the estate, and almost six years before Cartwright had acquired any interest therein. In these circumstances it seems incredible that any objection to the validity and the fairness and the legal propriety of the sale thus made could be entertained. The exceptant, Cartwright, had no interest in the estate, and of course had no right to object or intervene in any manner, and in point of fact he did not do so. But it is asserted by the appellant, and not denied by the appellee, that the person from whom he six years later acquired his interest, and who alone at the time the sale was made had the right to

speak and act on behalf of that interest, did assent to the sale
at the price mentioned, and we cannot possibly see why his
assignee is not absolutely bound by his action.  As to sur-
charging this accountant in this state of facts, when there must
be actual proof of supine negligence added to the proof of inad-
equacy of price in order to sustain such a claim, it is simply
incomprehensible how or on what principles of law or equity
such a decision could be made.  There is no evidence that any
objection to the sale was ever made by James.  The adjust-
ment and settlement of the estate proceeded for nearly six years,
during all of which he retained his interest.  The $30,000 re-
ceived from the purchasers of the goods was constantly being
used in paying debts and expenses of the estate, of all which
he must be presumed to have had knowledge, and during all
this time he and all the others who were interested participated
in the fruits of the sale, and the immense advantages which re-
sulted from the use of them, and not one of them all ever made
the slightest objection to the sale.

But the case on its merits is far stronger even than this.  The
sale itself was by the clear preponderance of the best informed
testimony in the cause made for a fair and reasonable price.
On this subject the contention for the appellee is chiefly urged
upon the difference between the inventory price and the actual
sale price.  Now an inventory is not conclusive upon anybody.
It is the opinion of the appraisers as to the value of the goods,
and the real value of the opinion depends upon the qualification
of the appraisers and upon the principle of valuation on which
they proceeded, as well as the actual care taken in ascertaining
the real value of the goods appraised.  It is prima facie evidence
of value, but is liable to be questioned by any party in interest,
either as being too low or too high.  The inventory was made
by Alexander Leggate, who was engaged in real estate business
and as an auctioneer, and James Semple, a brother of the dece-
dent, whose occupation was that of a florist.  Neither of these
persons could possibly have been qualified to adequately ap-
praise a stock of merchandise comprising a great variety of
kinds and qualities of goods.  After the decree of surcharge was
made, the appellant presented a petition to the orphans' court
asking leave to submit additional proof, which was relevant and
important, and being accompanied by sustaining affidavits ought

in our opinion to have been granted.   It is familiar doctrine in
the chancery practice that the door of equity is never closed,
and as the orphans' court is within its jurisdiction a court gov-
erned by equity principles and practice, we think this petition
should have been entertained and the case reopened for the intro-
duction of the proposed new testimony.   One of the supporting
affidavits was made by James Semple, one of the appraisers, and
in it he says: "I had no knowledge of the value of the stock of
goods, and the appraisement as made of the stock of goods in the
store was but an approximation.   We did not take an inventory
of the stock to determine the quantity. . . . We were not very
accurate or particular about the inventory and appraisement,
because we regarded it as a family affair."   That evidence if
received would have very seriously affected the importance of
the inventory as evidence of value.   But apart from this the
direct testimony of the most experienced and competent wit-
nesses showed that the price obtained was a fair and reasonable
cash price for the stock.   Thus Bernard Neuhause, an entirely
disinterested person, who was employed by his firm to examine
the stock of goods and value it for a purely business purpose,
testified that he had a very large experience in this class of
work for many years; that he went to Allegheny and spent sev-
eral days in examining the stock; that he found it to be a broken
stock, composed largely of old and unsalable goods; that he
made an itemized inventory of the whole of it, and that all he
was willing to value it at was $28,000, and that he considered
that a fair valuation.   He said further on cross-examination that
if he had represented the Semple estate he would have advised
them to part with the whole stock for $30,000.   Jacob Kauf-
mann, an old and experienced merchant of Pittsburg, who had
purchased whole stocks of goods at a number of different times,
and was thoroughly familiar with the dealings in such stock,
both at retail and wholesale, being asked what was the value of
the ordinary stock of dry goods a year old and with broken lots,
answered, "If I base my value on the goods that I know Sem-
ple's store at that time was carrying I would say about one third
of the inventory price would be a good value for it."   William
Semple, a son of the deceased, who had been engaged in the
store and in the outside business of his father for five years be-
fore his death, and who was thoroughly acquainted with the

conditions of the stock, testified as to its character and condition thus : "And the character of the goods, many of them were very old, had been there for a number of years. A number of the boxes on the shelves in the shirt department hadn't anything in them. You saw all the goods there were when you looked around. And in the gents' furnishing and in the millinery departments the sizes were broken; for instance, there would be a lot of gents' collars, all the average sizes would be taken out, $14\frac{1}{2}$ and 15, and they would have a lot of 18's on hand that had probably been there for ten years, some of them; and the same way in the millinery department, clothes, corsets, broken." As to the stock of shoes, he said : "Oh, the shoes ; very few people in the city would wear them; they had been on hand for a long time, broken, trying to close them out. Only kept those things any how to fill up and have something when people came in and asked for them. The cloaks, I believe, were probably the worse in the store, entirely out of style. I have known my father to sell $180 cloaks for $10.00, and I have seen him trying to sell $30.00 cloaks for $2.00, and they wouldn't sell at that. In the third floor was the dressmaking department, which was partitioned off, and that was hardly run at all; there were only two there, although years before my father did quite a dressmaking business. And the balance of the floor was carpets and oil cloths, mostly short lengths and old patterns." There was much more of the same kind of testimony from this and other witnesses which it is not necessary to repeat. It is sufficient to say that the testimony fully established the unsalable quality of the stock of goods. The witness further testified that it was absolutely necessary to open the store and keep it going until a purchaser could be found; that they had no cash and were obliged to sell it in a lump in order to get money to keep the notes and obligations alive by payments of interest and on account of principal, in order to save the estate from sacrifice on the stocks and other securities held by the deceased. On the subject of the sale of the stock he was asked: "Q. For what price was that stock of goods sold? A. $30,000. Q. Was that cash? A. Practically, yes. Q. You have stated that you had knowledge of the stock of goods on hand there, and that you had been assisting your father in the business of dry goods merchant there for some time; I wish you would state whether

or not in your judgment that was a fair and reasonable price for that stock of goods.   A. It was, yes.   I thought it a favorable price at the time.   Q. Did you believe that that was a better price than you could get by auctioning the goods off piecemeal? A. I certainly did; yes."   Francis M. Semple, another son of the deceased who was employed in the store during his father's life and after his death, and who had a most thorough and complete knowledge of the stock of goods and its condition, and who testified fully upon those subjects, was asked: "Q. To whom did you sell this stock of goods?   A. The entire stock was sold to Davidson & Sweinberg, New York City.   Q. For what price?   A. $30,000.   Q. Was that cash or not.   A. Cash. Q. Was that a fair and reasonable value for that stock of goods? A. I thought so and I think so now.   Q. Would you in your judgment have been able to have made more money by the sale of that stock of goods at auction there in that store, say in different prices?   A. No.   If the stock had been sold it would probably have brought twelve or fifteen thousand dollars; the cream of it would have been picked out and we would have been left with the old stock on hand."   Mrs. Marion Semple, the widow, was examined, and after testifying that she had assisted in the store at one time and was familiar with the stock, was asked: "Q. How had the store of your husband been operated for some time prior to your husband's death; I mean in a general way?   Had the store been operated in as lively a manner as it was formerly?   Was the stock maintained in a large quantity or otherwise?   A. Oh no, the stock was very much run down.   My husband gave very little attention in fact to the store.   Q. Do you know whether he was endeavoring to get out of the dry goods business?   A. He was.   Q. Well what was the character of the stock of goods in the store at the time Mr. Semple died, in a general way, as far as you know?   A. Oh yes; I knew the stock was very much run down.   And Mr. Semple, in view of getting out of business, did not keep it up. Q. Can you specify particulars — can you recollect any of the departments?   A. Well, the stock of course was old, a great deal of it worth very little and of course it was made up, some of it, just by boxes and packages and one thing and another like that to make appearances. . . . Q. Did you conduct the negotiations, or who did, for that sale?   A. My two boys.   Q. And

for what price did you sell this stock? A. $30,000. Q. Did you regard that at the time as a reasonable and fair price for the stock? A. I thought so. Q. Do you think so now? A. I do; and then I felt that my instructions were carried out, the instructions I had to take the first offer, as my husband wanted me to." Mrs. Isabella Sweinberg, wife of one of the purchasers, after having testified to her experience in the dry goods business for a number of years, and to the fact that she was sent over to superintend the selling out of this stock of goods, which she did for six weeks, and to her thorough acquaintance with the stock in all its details, was asked: " Q. What was a fair and reasonable value for the stock of goods on hand in that store at the time your husband got it? A. I would consider the price paid a fair and reasonable price for the stock, $30,000."

The question to which the foregoing testimony was directed was what was the fair and reasonable selling value of the stock at the time of the sale. This is the crucial question upon the subject under consideration, to wit: the propriety of surcharging the accountant upon the basis of negligence in making the sale. All of the six witnesses examined possessed exceptional qualifications for testifying as to the selling value of the stock. They knew it intimately, in the whole as well as in detail, some of them knew of the unsuccessful efforts that had been made to sell the stock, three of them, the mother and two sons, had a large personal interest in the stock, and were naturally most anxious to get the best and highest price that could be obtained, and all of them were specially qualified to form an intelligent opinion upon the subject. The whole six of them concur in saying that $30,000 was a fair and reasonable price for the stock. One of the sons testified to the unsuccessful attempt to sell it all for $45,000, and that too in exchange for Western lands.

Against this testimony the appellee examined five witnesses who had been at different times employed as clerks in special departments of the store. Not one of them had taken any itemized inventory of the whole of the stock, and none of them assumed to do more than to give a conjectural estimate of the value of the whole stock. In their estimates they differed all the way from $90,000 to $150,000 as to the value of the whole. So that it is at once apparent that there could not be and was

not any element of certainty, or even reasonable probability, upon which the judicial mind could rest with any degree of satisfaction in making a most important decree upon this subject. Not one of these five witnesses gave any opinion as to what was the actual selling value of the stock as contrasted with the intrinsic value of the goods. Several of them admitted to an acquaintance only with the quantity and value of the particular line of goods in which they were employed, and some of them, admitted that their estimates were mere conjectures. Thus one of them, Stevenson, said in reply to a question, " Oh, yes sir, it is all a guess. Anything I give you on the value of the stock would be a guess." And yet he was the witness who had testified to an estimate of $125,000 to $150,000 as the value of the whole. Another of these five witnesses, Sauer, was asked: " Q. Now, Mr. Sauer, from your knowledge of dry goods in general, and from your knowledge of that stock, state first what the entire stock of those six floors or five floors and the basement, was worth at the time of his death. A. I wouldn't like to make a statement just now to that effect, because I was two years on the same floor and I didn't get around over the house as much as I was before. Q. Are you able to state then what was the value of the stock at the time of his death? A. No, I couldn't put an estimate on it at the time, I could give you an estimate about what was on the second floor." Another of these five witnesses, Hamill, who was examined as to the general condition of the business at the time of the decedent's death, said that he had entered the employment of a Mr. Mackie, who had a rival store next door to Semple's, and who was a competitor of Mr. Semple's trade, was asked: " Q. As a matter of fact he took a great deal of Mr. Semple's trade; didn't he? A. That is true, sir. . . . Q. Mr. Semple's business had fallen off very considerably? A. Oh, it had since I went there first. Q. There was a continuous falling off in the trade? A. I suppose you would call it that. It wasn't as good as it was in the early eighties." Later he said the number of clerks had run down from 150 to forty or fifty.

Cohn, another of appellee's witnesses, and upon whose testimony the court below rested chiefly, estimated the stock at from $90,000 to $110,000, but said that he and some other of the clerks would have given $75,000 for the stock if they had

had the money. This, however, is not the true test of the actual selling value under such an inquiry as is necessary here. It is not what some irresponsible persons would be willing to do if they had the money. The matter at issue was far more serious than that. It was absolutely necessary that the stock should be sold quickly and for cash. How much actual cash could be had for the goods at once, or within a very short time? That was the question. After repeated efforts the accountant and her children found they could get $30,000. Could they have got more? No one has so testified. Not a solitary witness has testified that he would have given more. No evidence has been produced to show that if they had waited longer a better customer could have been found. There is no testimony in the cause showing that, in any way, or by adopting any means, a single dollar more than $30,000 could have been obtained. The accountant offered to prove, by the testimony of her husband's brother that he advised her strongly to accept the offer, although he was one of the appraisers who had valued the goods at a much higher figure. Her sons, having a large personal interest in the property, actually negotiated the sale, thus proving that they were satisfied with the price. Six competent and experienced persons have testified that it was a fair and reasonable price. What was she to do? There was really nothing to be done but to accept the offer or incur the hazard of utter ruin and the absolute insolvency and loss of the whole estate. Whether the course adopted was wise and prudent and free from negligence is best proved by the results which followed. With the money obtained by the sale negotiations were made with the horde of creditors who were waiting for their money. Concessions were secured by making payments of interest to some, of sums on account to others, renewals of notes payable in bank were obtained, the accountant loaned the estate quite considerable sums of her own money from time to time in aiding to carry out this policy, and in these and kindred ways the securities of the estate were carefully preserved until better prices were available. As opportunities offered some of them were sold for good prices; all the revenues and resources of the estate were called in. Some of the most valuable assets of the estate had to be litigated in order to secure them. Several important lawsuits were brought and tried to the end, and in every case successful results fol-

lowed.   Finally, after eight years of constant efforts, struggles, persevering contentions, distinguished by the most careful and prudent management in all respects, a great success was accomplished.   The real estate was loaded with $65,000 of mortgages. The whole of the vast debt of $247,000 was extinguished.   All the mortgages except $14,000 were paid off, and the overburdened estate, which when it came into accountant's hands was utterly insolvent, was saved and redeemed for the devisees and legatees named in the will to the extent, as is alleged on behalf of the appellant and not denied by the appellee, of several hundreds of thousands of dollars.   And yet, notwithstanding all of these facts, this accountant has been surcharged by the court below to the amount of about $70,000, on the ground chiefly that she has negligently administered the estate.   We are constrained to say that to us it seems most unreasonable to draw such a conclusion from such a state of facts.   Having carefully and patiently read and considered the testimony, we fail entirely to discover any proof of any negligence whatever on the part of this accountant.   On the contrary, we are thoroughly persuaded that her custody and management of this estate was distinguished by an unusual degree of care, prudence, skill, good judgment and wise policy, of which the most convincing proof is the ultimate results obtained.   It is indeed a rare occurrence in the reported cases to find an instance in which such extremely important advantages have been secured to an estate.   Entertaining these views, we cannot possibly sanction the surcharge of $48,030 for loss in the sale of the stock of goods, or any part of it, and we therefore sustain the first assignment of error.

On the subject of the accountant's compensation we are also of opinion that the learned court below was in error.   The accountant claimed credit in her account for her compensation the sum of $17,895.82, being a commission of five per cent on the actual disbursements made by the accountant, to wit: $357,916.46.   The actual transactions of the estate amounted to $2,006,758.51, owing to the necessity of constant renewals of the numerous promissory notes given by the decedent, during the long period of eight years throughout which the settlement of the estate was necessarily protracted.   The compensation claimed was less than one per cent upon the actual transactions of the estate.   The severe and arduous exertions of the account-

ant, which were necessarily required for the preservation ot the estate from ruin, can well be imagined. Amongst other difficulties and troublesome matters she had to contend with were four litigations she was compelled to institute for the recovery of disputed rights to which it was claimed the estate was entitled. Two of these were conducted through the lower courts and through this Court, and all of them resulted successfully to the estate. As a consequence of the careful, prudent management of the estate by the accountant, the great load of indebtedness with which it was burdened when she undertook its administration, amounting at that time to $247,644.11, was all paid off and the real estate, which was incumbered with $65,000 of mortgages, was relieved of the whole amount of liens except $14,000, and the estate instead of being bankrupt as it was when she assumed the charge of it, now goes to the parties entitled free of debt and with its whole value unimpaired. Looking at the whole case, and considering the great value of the accountant's services to the estate, and considering also that not one member of the family objects to the compensation claimed, we are clearly of opinion that the whole amount for which credit was taken in the account should have been allowed. We regard it as a fair, reasonable and proper compensation, and that in view of all the circumstances of the case the learned court below was in error in rejecting any part of the claim. We sustain the fifth assignment and direct the surcharge of $12,792.28 of the amount claimed as compensation to be stricken out, and that the whole amount claimed as compensation for the services of the accountant in the two accounts, to wit: the sum of $17,895.82, be allowed.

The court below further surcharged the accountant with the amount of annuities paid to Mrs. Spiegel and Mrs. Gardner, two of the decedent's daughters, the sum of the payments to both being $16,044.44. The question upon this subject arises under the peculiar wording of the will. The language of that instrument is, "I devise all my real estate, and give the income of all my personal estate, to my widow Marion Semple so long as she remains my widow and no longer, subject to the following charges: I give and bequeath to each of my two daughters, Mrs. Spiegel (now of Chicago, Illinois) and Mrs. Gardner (now of Micalder, Scotland) so long as my widow remains unmarried,

the sum of one thousand dollars ($1,000) payable out of my estate yearly in quarterly payments."

The question of surcharge arises in this way. The widow was made sole executrix of the will, "with plenary powers to execute and carry out its provisions." Whatever was to be done so far as this subject is concerned was to be done by her. Necessarily it devolved upon her in her capacity as executrix, to pay to the two daughters their respective legacies of $1,000 each "yearly and in quarterly payments." She was also enjoined by the will to pay these legacies out of the estate of the testator, because that is the plain meaning of the language of the will. The legacies are given to the daughters named, "payable out of my estate." There is no debate needed over the meaning of these words. They are not ambiguous or doubtful in the least degree. They mean precisely what they say, to wit: that the executrix shall pay out of the estate of the testator, $1,000 dollars yearly in quarterly payments, to each of his two daughters. This she has done literally and in precise compliance with the explicit directions of the will. She has filed her account as executrix, and in the account she takes credit for each quarterly payment at the date of each payment. Is she not entitled to such credit? The court below held she was not and rejected the credits. Here is all the court said about it: "The item of $16,000 paid annuities is clearly improper in this administration account, particularly in view of the fact that the assets are needed for the payment of creditors." This is absolutely all that appears either in the opinion of the court or in the opinion on the exceptions upon this subject. If it were in fact true that the money was needed for the payment of creditors there would be force in the objection to the allowance of the credits. But the statement is not correct in fact, and hence all the force there might be in it if true disappears. As we understand from the repeated statements of counsel for appellant, not at all contradicted by the appellee, the decedent's debts are all paid except about $14,000 secured by mortgage on real estate, and there is still a large amount of cash securities on hand, about $42,000, as appears in the account, and the annuities are all paid. The implication that these credits ought not to appear in the administration account has no force in view of all the circumstances. The annuities were a charge upon

the estate, and were payable just as debts were payable if there were sufficient assets for the purpose.   The credits were taken in a separate and independent part of the account, and were not mixed with the general credits for debts and expenses, and it is a matter of no consequence that they were not made part of a distribution account.   No such account has as yet been stated, and these items would not necessarily be a part of such an account, as they are not a part of the distribution of the estate, but are a charge upon the estate prior to any distribution.   That which is to be distributed among the ultimate legatees is only the residue left after the payment of the annuities and all debts and expenses of administration.

While however the learned court below did not surcharge the accountant with the annuities, upon the theory that they were a personal charge upon the widow, the appellee contends that they were of that character, and therefore the surcharge should now be sustained.   The argument in support of this contention is founded upon the words, "subject to the following charges," contained in the devise and bequest to the widow. The manifest answers to this contention are (1) that the testator did not declare in the will that the annuities should be a personal charge upon the widow, and (2) that he did positively direct that they should be paid out of his estate.   The requirement of the words, "subject to the following charges," is easily satisfied without imposing any personal liability upon the widow. The testator had just given in the same sentence to the widow all his real estate and the income of all his personal estate, as long as she remained his widow.   This gave to her the entire usufruct of all the real and personal estate of the decedent during her widowhood, but as the annuities would have to be paid out of the personal estate if sufficient, or out of the income of the real estate if necessary, it is manifest that the widow would take her provision under the will subject to the payment of the annuities, because their payment would diminish to that extent the estate which would otherwise pass to her or for her use.   In this sense she did and does take her provision "subject to the following charges," that is, subject to the payment of the annuities, but not out of her income, because the very next clause of the will directed that the annuities should be paid out of the testator's estate.   No such thing

as a personal liability to pay annuities resting upon the widow is anywhere either expressed or intimated.  On the contrary, the very opposite intention is distinctly expressed in the next clause of the will.  We therefore sustain the second assignment of error and direct the surcharge of $16,044.44 to be stricken out, and the credits for the payment of the annuities to be restored.

We are of opinion that the surcharge of $1,512.78, amounts paid for office rent, carpets and general expenses in maintaining an office for about eight years in which to transact the business of the estate, should be overruled.  The necessity for conducting the business, which consisted of such an immense amount of transactions of many different kinds, in an independent office, which should be at all times accessible to creditors and other persons having business with the estate, is quite apparent, and is fully sustained by the testimony.  The third assignment of error is sustained, and the surcharge of $1,512.78 is stricken out, and the credits therefor are restored.

We also reverse the surcharge of $61.54 for ice and other items furnished for the store.  We see no sufficient reason in the testimony for imposing these expenses upon the accountant.  We sustain the seventh assignment of error, because we think the accountant was fairly entitled to a rehearing to introduce testimony in support of her position.

We sustain all the remaining assignments of error, not because they are very material to the determination of disputed matters in the adjustment of the account, but because, as it seems to us, they contain erroneous views and rulings upon the testimony.  They are not of sufficient importance to go over them in detail.  In conclusion we have to say that all the parties originally interested in this estate are entirely satisfied with the account, and have filed no exceptions to it.  The only exceptant is one who purchased a one-ninth interest in the estate for $2,150 in the year 1895, after all the work of rescuing the estate from bankruptcy had been accomplished, and at a time when the interest he bought was worth many times the amount he paid for it.  For this greatly enhanced value of his interest he is indebted entirely to the efforts, the care and good management of the accountant and her sons.  Notwithstanding all this he has persistently attempted to force upon

the accountant enormous, ruinous and unjust surcharges.   He
has justly failed in his ungracious proceeding.   His unneces-
sary litigation has produced nothing but annoyance, vexation
and expense to the accountant and her children.   As a litigat-
ing party, however, he must accept the consequences of an un-
successful contest, and defray the cost of the litigation.   The
assignments of error are all sustained.

And now, January 3, 1899, the decree of the court below in
this case on the first and second accounts of Marion Semple,
executrix of William Semple, deceased, is reversed, and the
correct decree is now stated and entered as follows:

The following surcharges are hereby stricken out, viz:

| | | |
|---|---:|---:|
| The surcharge on the inventory value of the goods . . . | $48,030.00 | |
| Amount paid for office rent, etc. | 1,512.78 | |
| "        "     ice for store . | 61.54 | |
| Items of credit paid Mrs. Spiegel and Mrs. Gardner . . . | 16,044.44 | |
| Making a total of items to be stricken out . . . . | $65,648.76 | |
| Balance as ascertained by the decree of the court below . | 125,736.64 | |
| Deducting above total . . | 65,648.76 | |
| Leaves a balance in the hands of executrix of . . . . . . . | | $60,087.88 |
| which is the balance hereby found to be in her hands, as shown by said accounts, and this balance is distributed as follows : | | |
| Clerk costs . . . . | $     10.00 | |
| Accountant's commission on first and second accounts . . | 17,895.82 | |
| L. D. Iams, stenographer . . | 302.40 | 18,208.22 |
| Deducting this amount from total balance in her hands, to wit: $60,087.88, leaves a balance in her hands of . . . | | $41,879.66 |

which includes stocks, bonds,
etc., the balance of inven-
tory, as shown by second'ac-
count.

And it is hereby ordered and directed that the said executrix dispose of said balance under the further order and decree of the orphans' court of Allegheny county; and that all the costs of these appeals and the costs in the court below be paid by R. W. Cartwright, the exceptant and appellee.