## ESTATE OF JOHN GILPIN, DECEASED.

APPEAL BY J. II. MCCAIN, EXR., FROM THE ORPHANS' COURT OF ARMSTRONG COUNTY.

Argued October 14, 1890—Decided November 3, 1890.
[To be reported.]

1. When an auditor and the court which appointed him have arrived at widely different conclusions, it is the duty of the Supreme Court, on appeal, giving the report of the auditor the weight to which it is enti-

tled, to determine which view of the case best accords with the facts and the law; and, in considering a question of compensation to a trustee, it may differ from both.

2. The ordinary commission of an executor who has carefully managed an estate is five per cent, and more than that will not be allowed without evidence of unusual services or responsibility; compensation, however, is the rule, and when the executor has had to encounter extraordinary difficulties and responsibility, he is entitled to be compensated accordingly.

3. In this case, the testator having left his estate in a state of great confusion and complication, the Supreme Court, upon a consideration of all the facts, allowed the executor $4,650, for services rendered down to the filing of a partial account, in which the debits and credits amounted to over $92,000 and $89,000, respectively, the cash actually handled being less than $68,000.

Before PAXSON, C. J., STERRETT, GREEN, CLARK, WILLIAMS, McCOLLUM and MITCHELL, JJ.

No. 161 October Term 1890, Sup. Ct.; court below, No. 6 December Term 1886, O. C.

On December 8, 1886, James H. McCain, executor of the will of John Gilpin, deceased, stated a first and partial account in the estate of his testator. In said account, the accountant charged himself with assets aggregating $92,183.91, of which the sum of $67,775.26 represented cash actually collected. The credits claimed in the account aggregated $89,334.31, the cash expenditures included therein amounting to $64,925.66. Said expenditures were for debts of the estate, annuities under the will, attorney's fees and other expenses, and the compensation of the accountant, the amount of such compensation being stated at $6,300. The accountant was the law partner of the testator at the time of the latter's death.

Elizabeth McConnell, guardian of Mary E. A. Gilpin, the minor daughter of the testator, and Ephraim Buffington, committee of Olive Gilpin, the testator's widow, filed exceptions, inter alia to the amount of the credit claimed for compensation by the accountant, which exceptions were referred by the court to *Mr. Calvin Rayburn*, as auditor.

The report of the auditor, so far as it related to the question of the accountant's compensation, was as follows:

Auditor's Report.

J. H. McCain, the executor, has charged in his account, for his services, the sum of $6,300 for administering upon the estate to the amount of $89,334.31. Now, the question is, is that amount excessive? The question is not one of percentage, but of compensation; and your auditor must be governed by the testimony.

The testimony shows that John Gilpin had real estate in different parts of the county, viz., in Valley, South Buffalo, North Buffalo and Kiskiminetas townships, and in Kittanning borough, and some in Maryland; that of some of these tracts he was the owner in fee, and in some he had but a share; that the executor had control of the real estate of the decedent; that, in reference to these properties, the executor had settlements to make as to the rents, taxes, repairs, etc., and from the manner in which the accounts had been kept by Gilpin it was very difficult to ascertain just what were the exact rights and credits of the estate.

Mr. McCain details in his testimony the condition of the business of Mr. Gilpin, the trouble they had in getting things straightened out, and the manner in which the accounts had been kept. Memoranda in diaries, on stubs of checks and loose receipts, and a cash book, seem to have constituted the " books " as kept by Mr. Gilpin, and with as much business as he had, we cannot help but conclude that it would be a great source of trouble to the executor, and require the greatest care and attention to save the estate from loss in the different settlements. With such a set of books, the amount of his business, and the long runs without settlements, I do not wonder that the other two executors, named in the will, refused to join with Mr. McCain in the administration of the estate.

There has not been any evidence offered by the exceptants, on the question of compensation, save the account; and it is argued that by an analysis thereof the result would show that there have not been sufficient services to warrant such a charge. Mr. Buffington has made a very earnest effort to show by the different items of the account that the compensation claimed is too large, while the accountant has called Hon. James Mosgrove, Mr. Wm. Pollock and James G. Henry, Esq., as witnesses to show the value of the services. Mr. Mosgrove, in answer to question, said: " From my experience with the Brown

Opinion of Court below.

estate, it would be a pretty big fee that would be able to get me to undertake anything like that again. I don't know whether Mr. Gilpin's was so complicated, or anything like Mr. Brown's, or not. I would not undertake such another estate, that was complicated like Mr. Brown's was, for ten per cent." He also states that the charge of $6,300 would not be too high for the three years' service, with the amount of property to look after. "I had to settle with John Gilpin, and from the trouble we had on that account, I know he had his books very much complicated. I think we were working backward and forward for two or three months." Mr. Pollock states: "From my knowledge of what trouble he has had, and what he said, I would have charged $8,000." Also, that $6,300 is a very low charge for three years' service. James G. Henry, also, testifies as to the compensation charged by the executor being a fair one and not exorbitant, and he seems to have been engaged at different times as a trustee, etc., and has had experience in such matters.

Now, from the evidence of Mr. McCain showing the amount of trouble and complications in the accounts of Gilpin and the work done by him in settling the estate, and the care of the real estate, and the responsibility attending the settling of such estates, and that supported by the evidence of men of experience and knowledge in such matters, like Mr. Mosgrove and Mr. Pollock and Mr. Henry, stating the services are reasonable, we are compelled to dismiss this exception to the accountant's fees for services.

Upon exception to the auditor's finding, the court, Mc-Michael, J., 17th district, specially presiding, reduced the allowance to the accountant for services, filing an opinion in part as follows:

It has been repeatedly decided and must be taken as finally settled that a partial account when confirmed is conclusive only as to the items contained in it. That being true, it follows logically and necessarily that the compensation allowed in a partial account to an executor, should be confined to the proper compensation for administering the items contained in the account. If the compensation allowed should include pay for services outside the items in the account, then, when a future

Opinion of Court below.

or final account would be filed, there would be much uncertainty respecting what the executor had and what he had not been paid for, unless the services were much more specifically and particularly described than they have been in this case. . . . .

We come, then, to consider how much the executor is entitled to receive for the items for which he has accounted. The auditor heard the evidence of the accountant respecting the labor and trouble he had in settling the estate; and also the testimony of three witnesses who were offered as experts respecting the amount of compensation he should have. The evidence does not show that any of the three witnesses who were offered as experts were in fact competent to testify as experts. Nor does it show that, if they had been experts, they knew or had been informed of facts enough about this estate to make their opinions of any value. One of them had some knowledge of one estate which he assisted to settle. Another knew something of settling two estates. The third had experience in three or four; but none of them pretended to know the facts respecting the settlement of this estate, so far as it has been settled. They looked at the account as filed, for a few minutes, and then gave their opinions. To such men, a brief examination of this account would be very misleading. I have probably seen many more administration accounts than any of them has seen, and this account has taken hours of my time to solve its mysteries. I do not mean to say that it was purposely stated so as to mislead, but I do say that more than one half of what it contains should not have been in it; that its voluminous character makes it difficult to follow and to understand. I think the learned auditor erred in giving any weight to the opinions of these three witnesses, because it does not appear that they had sufficient knowledge of the facts to make their opinions valuable.

The testimony of the accountant, if it be conceded that he was a competent witness, does show that he has spent time, had trouble and care in administering the estate for which he has accounted. But his testimony does not show that his time, trouble, care, expense and responsibility have been ten times as great as that which administrators in ordinary estates have, and yet the amount for which he has accounted is ten times as large as the average estates which are settled. I have not found

Arguments.

anything in the evidence which shows that this executor is entitled to a greater proportion of the assets which he has administered and for which he has accounted than is ordinarily allowed for administering like assets.

[After a careful examination I am convinced that the following is a reasonably liberal allowance as a compensation to this accountant for that part of the estate for which he has accounted in this partial account:

On $25,405.37, cash, . . . . . 3 per cent, .   .     $762.16
"   41,118.46, collected, . . . . . 5 per cent,   .   2,055.92
"   1,251.32 rents collected, 10 per cent,   .   . 125.13
For unusual traveling expenses, .   .   .   .   56.79

$3,000.00] [1]

—Thereupon the accountant took this appeal, assigning, inter alia, for error:

1. The portion of the opinion embraced in [   ] [1]

*Mr. M. F. Leason*, for the appellant.

Counsel cited: (1) As to the weight which should be given to an auditor's finding of facts: Fahnestock's App., 104 Pa. 46; Miller's App., 30 Pa. 478; Gilbert's App., 78 Pa. 269; Speakman's App., 71 Pa. 29; Whiteside's App., 23 Pa. 114; Wissel's App., 4 Penny. 236. (2) As to the measure of compensation: Harbster's App., 125 Pa. 3; Barclay's App., 15 P. L. J. 416.

*Mr. Joseph Buffington* and *Mr. Charles C. McCandless* (with them *Mr. Orr Buffington*), for the appellees:

Complications of the estate connected with settlements for moneys collected by the decedent, as a member of the firm of Gilpin & McCain, cannot be made a basis for charges by the accountant here. As the surviving partner, he was bound to settle such business, whether he was executor or not: Hill on Trustees, § 575; Beatty v. Wray, 19 Pa. 516; Brown v. Mc-Farland, 41 Pa. 133; Brown's App., 89 Pa. 147; Sexton v. Bickel, 4 W. N. 322; McKeown's Est., 13 Phila. 339. As to the measure of compensation for services as executor, see: Montgomery's App., 86 Pa. 234; Pusey v. Clemson, 9 S. & R. 211; Bean's Est., 1 Chest. Co. R. 350; Mayberry's App., 33

Opinion of the Court.

Pa. 258; King's Est., 11 Phila. 26; Wharton's Est., 11 Phila. 39; Poulson's Est., 11 Phila. 151; Burkholder's App., 94 Pa. 522; Rogers's Est., 17 W. N. 29; Gable's App., 36 Pa. 395; Skinner's Est., 4 Phila. 189; Eshleman's App., 74 Pa. 42; Clarke's Est., 1 Phila. 356; Brice's App., 95 Pa. 145; Wedekind's Est., 11 Phila. 68; Gump's Est., 13 Phila. 495. Even if approved by the court below, an auditor's finding which rests on inferences drawn by him, or on conclusions from reasoning, has not the same weight as a finding of a specific fact: Cake's App., 110 Pa. 67. It has still less weight when reversed by the court below, as in this case: Bachman's App., 38 Leg. Int. 393.

OPINION, MR. JUSTICE CLARK:

The only question presented for our determination in this appeal arises upon the compensation claimed by James H. McCain, the executor of the last will and testament of John Gilpin, deceased, on settlement of his partial account. It is a fact well established, that the testator left his estate in a most extraordinary state of confusion and complication. He was a lawyer by profession, and for twenty years or more prior to his decease, had been engaged in a large and lucrative practice. His individual affairs were confused with those of his clients. He had a peculiar way of doing business: he kept no regular books, trusting, perhaps, largely to his memory, and to loose memoranda which it was difficult after his death to find, and, when found, even more difficult to understand. Mr. Gilpin died on November 3, 1883, and it was not until August 26, 1884, that the appraisers were able to file an inventory. This proved to be so imperfect that a supplementary inventory was filed on the 10th October following, and, notwithstanding the time that had then elapsed, and the efforts that had been made, other assets of the estate were afterwards discovered, amounting to $19,000, and upwards.

The accountant in his testimony states, in substance, that he found Mr. Gilpin's papers in the utmost confusion; that he kept no proper accounts, either of his private or professional business. He made memoranda in his diary, upon letters, receipts, and stubs of checks, and these memoranda were of the most important transactions. Sometimes it took days to hunt

up one particular item. In his diary, he entered memoranda of his home and office expenditures, of money loaned and money received, his own personal business and the business of other people. He had no docket of his cases, or of his judgments; he had memoranda of them in little pass-books, and in other places. The executor was obliged to get a docket made up, with all his cases, both the judgments due him and the judgments he was concerned in. The diaries were collected and the various items contained therein were posted into a book. He says: "The entries in Mr. Gilpin's diaries were in the nature of mere memoranda; they were not such accounts as could be posted as book entries. Mr. Wright just took those diaries and put the items into the cash-book and ledger as they were. They were all mixed up; there was no regularity, and oftentimes nothing to show definitely what account the item really belonged to, so that when they *were* posted, whilst in many cases they were of assistance, in others we had to go back to the original diaries and hunt and study them up. We could not be guided by the posting, but that was a necessary step towards getting the accounts into shape." From 1860 to 1866, he took receipts in receipt-books, but after that his receipts were taken upon loose slips of paper, which were not filed away, but were thrown into a big box. His check stubs did not show for what the check was issued; sometimes the amount was wanting, sometimes the number, and in no case did the stub disclose the name of the person to whom the check issued. There was a book in the safe in which was found a number of his notes and obligations, but similar securities belonging to other people were found with them in the same book. There was also a large box in which other notes and obligations were found, but his own personal business was confused with the business of his clients and others.

The leases of his real property, and of the property he held in common with others, were some of them in writing, and some of them were merely verbal leases. There were bundles of old leases; and his father's estate papers, and his own, and his clients', were more or less mixed. He had real estate in Kittanning, in Valley township, in South Buffalo township, in North Buffalo township, in Washington township, and in Appollo; he was also interested in valuable real estate in Mary-

Opinion of the Court.

land, and, by the terms of the will, the executor was authorized to have charge of and to lease the testator's real estate. In Kittanning, he was interested in what is called the Eagle House block, a hotel property with business places and dwelling-houses; in the Schmauk property, and the Hartig property, also in the Lee property; and he owned the buildings in which were the office of Gilpin & McCain. Mr. Gilpin, in his lifetime, had charge of all these properties, and at his death, by the terms of the will these duties devolved upon the executor. The leasing of these various properties, the collection and application of the rents, the adjustment and payment of the taxes, the repairs and the insurances were matters which required constant care and attention and involved considerable responsibility.

The main difficulties in settling this estate, it would seem, did not consist in the collection and handling of the moneys, but in the ascertainment of the assets, in the adjustment of the accounts and claims, in the care of the real estate, etc. There was much litigation threatened, which, in view of the complicated and confused condition of Mr. Gilpin's accounts, might have been disastrous to the estate. But through the labors of Mr. Lee, who was not only "the life-long friend and adviser of Mr. Gilpin," but a lawyer of eminent ability and known integrity, much of this litigation was averted. Through his intervention, satisfactory settlements were effected, the items of which seem plain and simple, but as these items represent the result of many days of patient labor and arbitrament, the settlements themselves, as printed, show but little, perhaps, of the complications from which they were drawn. There was nevertheless, considerable litigation for the conduct of which the accountant was responsible.

Mr. McCain appears to have accepted the office of executor with reluctance; his co-executors named in the will, perhaps anticipating the difficulties to be encountered, renounced their right, and the labor and responsibility devolved upon Mr. McCain alone. The estate was large, and was involved in extraordinary difficulties; the responsibility was correspondingly great, and the accountant is entitled to receive compensation accordingly. The office of an executor or administrator is not one to be undertaken for profit, but it is not to be expected

that a business or professional man will sacrifice his own business, and subject himself to hazard, without suitable remuneration. Compensation is the rule. This court in many cases has said that five per cent is the ordinary commission of an executor who has carefully managed the estate ; more will not be allowed without evidence of unusual services or responsibility.

The accountant has adduced some evidence as to the value of his services ; three witnesses have testified that the compensation claimed is not excessive. He has himself given somewhat in detail the nature of the difficulties attending the administration of the estate, and has submitted his account as the result of his labors. The auditor, who had opportunity to examine the account in detail, and who saw and heard the witnesses, has sustained the charge. The exceptants have called no witnesses ; they rely upon the testimony adduced by the accountant, and upon the account itself, and contend that nothing has been shown to justify any extraordinary claim for compensation.

When the auditor and the court have arrived at widely different conclusions, it is our duty, giving the report of the auditor the weight to which it is entitled, to determine which view of the case best accords with the facts exhibited in the proofs, and the law as declared in similar cases: Fahnestock's App., 104 Pa. 46 ; and in the consideration of a question of compensation to an executor or administrator, we may differ from both. Upon a full consideration of the whole case, we think the accountant's charge is perhaps too high, but we are of opinion that the learned judge of the court below made too great a reduction. We have concluded that his compensation for services rendered to the time of filing this account should be fixed at $4,650.

> The decree of the Orphans' Court is reversed, the compensation of the executor to the time of filing this account fixed at $4,650 ; and, with this modification, the account, as adjudicated by the Orphans' Court, is confirmed ; the appellees to pay the costs of this appeal.