## Sinnott's Estate.

*Executors and administrators—Commissions—Unconverted assets.*
Where none of the inventoried assets of an estate have been converted, and the whole estate has been awarded back to the executors for further accounting, a commission of five per cent on the unconverted assets cannot be allowed.

Argued Feb. 1, 1909. Appeal, No. 213, Jan. T., 1908, by Clinton R. Sinnott, from decree of O. C. Montgomery Co., Oct. T., 1907, No. 6, dismissing exceptions to adjudication in Estate of Joseph F. Sinnott, deceased. Before FELL, BROWN, MESTREZAT, POTTER and STEWART, JJ. Reversed.

Exceptions to adjudication.

SOLLEY, P. J., filed the following adjudication:
Joseph F. Sinnott, a resident of the township of Lower Merion, died on or about June 20, 1906, testate, leaving surviving his widow, the said Annie E. Sinnott, and issue, several children.

His last will and testament, dated November 10, 1905, with codicil dated May 18, 1906, was duly admitted to probate June 25, 1906, and letters testamentary granted to the accountants, who with Samuel Castner, Jr., were appointed executors, the latter renouncing the trust.

The testator provided for the payment of his debts and funeral expenses, and expressly directed that should any balance be due on the principal of his bond with the accompanying mortgage secured upon premises 1816 S. Rittenhouse square, Philadelphia, belonging to his wife, it should be forthwith paid and satisfied as a debt of his estate. He devised and bequeathed to his wife one full equal third part of his personal estate absolutely, and one full equal third part of the rents and profits of his real estate for and during the term of her natural life, said devise and bequest to be in full of any dower or share which his wife might be entitled to in his estate under the intestate laws of the state of Pennsylvania. He di-

rected that his wife should be permitted to occupy, rent free, his residence known as Rathalla, situate at Rosemont, for the term of her life, should she so desire, and if she should continue to occupy the same, then during the first two years of such occupancy he directed the executors to pay her $25,000 a year during these two years for her support, and the support of any of his family residing with her at said home. Upon his wife ceasing to reside at or not wishing to occupy said home, he directed the same to be sold. He also bequeathed to his wife so long as she shall occupy said home all furniture, paintings, books, silver, household goods, etc., contained therein, with the offices, stables and equipments of the same, and the live stock of every description. In the event of the sale of said home, or his wife ceasing to live there, he empowers her to make such distribution of the contents, furniture and equipment, among all his children as she may deem fit, keeping for herself such portion as she may desire to furnish a home for herself and the unmarried children. Or, she may sell the whole of said furniture and equipment, if she deems best, and the proceeds, if not used by her for the purposes of furniture and equipment for a new home, shall become a portion of the residuary estate. In the event of the death of his wife before such distribution is made, the same power for distribution or sale of said furniture and equipment is given to Mary E. Sinnott, a daughter. In the event that said home is not sold until after the death of the wife and daughter, then the same power for distribution or sale is conferred upon John Sinnott, a son, and Annie L. Devereux, a daughter.

In the third and fourth items, legacies are given to a number of persons, without any deduction for collateral inheritance tax, United States legacy, or other tax whatsoever (which shall be borne and paid by the residuary estate), but the testator directs that none of these bequests, excepting the one to his brother, Rev. James P. Sinnott, in trust for the support of Agnes E. Sinnott, and the ones to his daughter, Mary E. Sinnott, and John Sinnott, in trust for Emily Harmer, and that to Martha McGahan, and those to his servants, shall be payable, except at the discretion of the executors, for a period of

five years after his decease, and that such legacies shall bear interest from his decease at the rate of four per cent per annum. All annuities shall be payable from the time of his decease.

In the fifth item the testator gives a number of money legacies to certain charities, free of collateral inheritance or other taxes, which he directs shall be borne by the estate, which said bequests shall not be paid until after the expiration of two years from the date of his death without interest, unless in the judgment of the executors they can conveniently be paid before that time. He provides that if at the time fixed for the payment of these legacies the market value of the assets of his estate after the payment of debts shall not exceed $1,000,000, then all the bequests to said charities shall be reduced one-quarter in amount, and if the value of the estate after payment of debts shall not exceed $500,000, then said bequests shall be reduced one-half in amount.

The rest, residue and remainder of his property and estate of which he shall die seized and possessed, he gives, devises and bequeaths to his executors and the survivor of them, in trust, to invest the personal estate, to rent, manage, sell, assign, transfer, mortgage or convey any or all of the real estate as may be necessary for the purposes of the trust, and to invest the proceeds derived therefrom, and to collect the rents, issues, dividends, etc., and after deducting necessary expenses of the trust, and paying the sum of $25,000 each year for two years to his wife should she occupy Rathalla as before provided, to pay, during the lifetime of his wife, one-sixth of the net income to his daughter, Mary E. Sinnott; one-sixth part to his daughter, Annie L. Devereux; one-sixth part to his son, Clinton R. Sinnott; one-sixth part to his son, John Sinnott. Another one-sixth part is directed to be divided into five parts, and during the lifetime of the wife to pay $3,000 annually to his son, James Frederick Sinnott, and the balance to Annie E. Sinnott, wife of testator. And out of the remaining four parts of said one-sixth part to pay one of said parts to the wife of said James Frederick, and the other three parts in equal shares to the children of said James. As to the remaining sixth part

of said net income to pay out of the same $3,000 annually to Clarence C. Sinnott, a son, and the balance to the wife of the testator.

The testator further provides for the payment of the income of the trust after the decease of his wife, but it is unnecessary at this time to refer specifically to the various provisions concerning the same.

At the time of his death and for many years prior, the testator was engaged in distilling liquor, and was the owner of what are known as the Gibsonton Mills or distilling property or plant, situate on the Monongahela river, at Gibsonton, in the state of Pennsylvania. He was solicitous for the preservation of this very valuable property and asset, and he accordingly provided in the eighth paragraph of his will, and expressed the desire, that a corporation should be formed for the continuance of the business; and he directed that said property and plant should be transferred to said company, either sold or leased. He further expressed the desire that the good will of the business and the property should be incorporated under the laws of such state as the executors and trustees deem most convenient and advisable. He authorizes and empowers the executors to accept in payment for such property and estate contributed and sold to such corporation the stock or bonds of said corporation, they, however, not to accept less than a majority of the stock or bonds issued as a first lien upon the franchise and property. Should the corporation decline to buy the merchandise and fixtures of the business, the executors are directed to sell the same in open market for cash. He outlines the entire scheme very completely. He believes a continuance of the business for a period of five years from the time of his death without forming a corporation might enhance the estate, and he recommends the executors and trustees so to do. In case they carry on the business he strongly recommends the employment of his son, John Sinnott, as general manager at a salary not less than $15,000 per annum. The whole plan is fully elaborated in this item of the will, and it is unnecessary to give further details.

In the same item he refers to his ownership of a large amount of the capital stock of the Philadelphia and .Reading Railway Company, which he urges on his executors to keep as an investment after his death, because of his great confidence in the probable increased prosperity of the company.

In the codicil a change is made in that part of the seventh paragraph of the will which relates to the distribution of one of the sixth parts of the net income of the residuary estate where he divided it into five parts and directed that out of one of said five parts $3,000 per annum should be paid to his son, James; and the remaining portion to the wife of the testator, and to the wife and children of James. This provision is revoked, and in lieu thereof he directs that from said one-sixth part of said income $1,200 shall be paid annually to his daughter-in-law, Edith, wife of James, in equal monthly payments so long as she remains the wife or widow of said James, and the remainder of said six parts is directed to be divided into five equal parts. Out of one of said parts $3,000 is to be paid annually to James, and the remainder of said one-fifth part to testator's wife during life. Another fifth part is to be paid to said testator's wife during life, and the other three-fifths part paid to the children of said James in equal shares.

At the time of his death the personal estate of the decedent consisted of cash, bonds, notes and corporate stocks, and the assets of his business at Gibsonton Mills, and at the warehouses in Philadelphia, New York and Boston. The inventory value of his personal assets was $2,351,830.20. The largest and most valuable asset was the latter.

The cash on hand belonging to the business was $ 61,334 98
Bills receivable.................................    7,575 68
Accounts receivable and considered good......    212,103 30
Miscellaneous accounts receivable............    9,233 94
Merchandise...................................  1,089,632 72
Machinery and fixtures.......................    114,860 64

The death of the testator caused a closing down of his vast business because of the strict regulation of the United States government. The distillery was closed, as well as the rectifying establishment at 242 S. Front street, in the city of

Philadelphia. In order that the business might be resumed, it was necessary for the executors to obtain license from the court of Philadelphia, and from the court of Westmoreland county. And it also became absolutely necessary for the executors to furnish large bonds to the United States government. They were required to give bonds aggregating in amount about $2,509,000, and, as we understand, these bonds are required to be annually renewed. There were about 40,000 barrels of whisky in the bonded warehouses at Gibsonton, and 30,000 barrels more belonging to customers. The decedent had established agencies in the cities of New York and Boston. Expert accountants were retained to examine the books and accounts of the decedent's business so that the executors might be properly informed of the situation.

They retained Mr. John Sinnott as manager, as the testator expressly recommended, at a salary of $15,000 per year, and they placed a Mr. Daly in charge of the business at Gibsonton.

The importance of the business, the great responsibility resting upon the executors, their positive duty to manage it for the best interests of the estate and those interested, called for the best business judgment, and the executors very properly resolved themselves into a board of directors, so to speak, held regular meetings, kept full minutes of every proceeding and acted after full consultation and due deliberation. There were frequent consultations with the expert accountants, the manager, and those in charge of the business at Gibsonton. The manager was required to furnish accounts of the business each month; a full detailed statement every three months. There were daily consultations with the manager and the executors' counsel. Many difficult questions arose day after day requiring not only work and labor to solve, but also the application of the very best business judgment. Under the laws of the state of Massachusetts, in order that the agency business in the city of Boston might continue, ancillary letters on the estate were required. This involved additional labor and responsibility. Another matter of grave concern arose out of the failure of the Real Estate Trust Com-

pany of Philadelphia, the surety upon the bonds given by the executors to the United States. Immediately after the public had been informed of the failure of the company, United States officials notified the executors to file new bonds. This required the executors to find additional surety and to act without delay, because failure to comply with the demand of the government would have resulted in the closing down of the entire distillery business.

We have gone somewhat into detail at this point of the labor and responsibility of the executors of this estate, because one of the children has objected to the compensation claimed by the executors in the account before us, and which will be disposed of later on.

The account of the executors was filed August 26, 1907. They have charged themselves with the amount of the inventory and appraisement, and certain other items of principal not included therein. They have taken credit for sundry disbursements, and show a balance of principal amounting to $2,200,346. They have in hand, however, unconverted assets consisting of bonds, notes and stocks all itemized in the account; value of the distillery business, and the appraised value of the household effects, etc., at Rathalla, amounting in the aggregate to $2,229,730.30. But $10,000 has been credited in distribution, the cash being taken from income, and there is due accountants $39,384.30. There has been paid to Margurite A. Donnelly and James A. Donnelly each, $5,000, the full amount of their legacies, and this $10,000 represents the distribution account before referred to.

There is attached to the account a summary of the management of the decedent's business for the year subsequent to his death, as conducted by the manager, John Sinnott, showing a profit of $228,255.23. This amount is not actual cash, but it is the net result of the operation of the business, as shown on the books, and is embraced in the assets of the business.

Income to the amount of $27,734 is accounted for. Where an objection is made to the compensation of accountants credited in the account, we have never denied a hearing;

indeed we think the court whenever appealed to should investigate the compensation claimed by the accountant, and determine what is just and fair.

In this case the executors filed an answer, and at the hearing they authorized counsel to state that they courted the fullest investigation. We consented to hear and pass upon the whole matter.

In Lilly's Estate, 181 Pa. 478, it is said that, "The labor and responsibility involved in the proper administration of the estate and the care and skill shown by the executors in the performance of the duties connected with the trust, must be taken into consideration in passing upon their claim, and so must the direction of the testator in regard to commissions for their services."

It was also said, "There can be no doubt that in a very large majority of estates of decedents there has been an allowance to the executor or administrator of a commission of five per cent."

In the opinion of the court, the very early case of Pusey v. Clemson, 9 S. & R. 204, was referred to and the language of Chief Justice TILGHMAN quoted. He said, "It is very desirable both for the sake of the executors and the family of the testator that there should be some standard to which both may look on the subject of commissions. And in the cases which generally occur, it appears to me, after considerable research, that the common opinion and understanding of this country is fixed upon five per cent as a reasonable allowance. But to this rule there must be exceptions. There are estates, where the total amount is small, and that too collected in driblets. In such, five per cent would be sufficient. On the contrary, there are others where the total being very large, and made up of sums collected and paid away in large masses, five per cent would be too much. It must be left to the courts to ascertain those cases in which the general rule should be departed from." And the court declared that this quotation states, as fairly as any that can be made, the present state of the law in relation to the allowance of commissions to executors.

But it is said in Wistar's Estate, 192 Pa. 289, that there is no set rule as to percentage on the estate in cases of the exceptional nature of the accountant's labor. The rule is fair compensation for the amount and character of the labor. The responsibility involved in large estates is also an element to be compensated, though not a controlling one.

Or, as it is more elaborately stated in Harrison's Estate, 217 Pa. 207, the rule as to commissions in all cases is compensation for the responsibility incurred and the services and labor performed. "In arriving at the compensation to which a trustee in any capacity is entitled," says the court, "it is necessary to consider the amount of the estate, the labor performed, and the responsibility imposed."

These are elements which enter into and determine not only the amount of the compensation, but the right to compensation at all.

This was practically an affirmance of the rule laid down by Chief Justice GIBSON in Harland's Account, 5 Rawle, 323. So that there is no rate of percentage fixed by rule as compensation for an executor, administrator, guardian or trustee. It is usual to allow a percentage of the fund, but that is not the legal way to ascertain what commission a trustee is entitled to for the responsibility incurred and the services performed in the execution of his trust. See also Young's Estate, 204 Pa. 32; Moore's Estate (No. 2), 211 Pa. 343.

A very complete brief of the cases in Pennsylvania on the subject of the commissions or compensation of trustees is that of counsel for appellee in Wistar's Estate, 192 Pa. 289.

In addition to the facts already found concerning the responsibility of the accountants, and the vast amount of labor performed by them, all of which were unusual and extraordinary, it was also made to appear that in conducting the vast business interests of the decedent since his death, imposed upon them by the testator, a very large amount of money has passed through their hands, and as the result of their management of the business, a net profit to the estate of $228,255.23 is shown. It is true that the 10,000 shares of stock of the Philadelphia and Reading Railway Company have not been converted; neither

has the distilling business, etc. These two items constitute the greater part of the estate remaining in the hands of the accountants unconverted. But the mere fact that this property has not been converted into money or that the corporation referred to in the will has not been created ought not to deprive the executors of their proper compensation for the performance of their duties.

It was the express desire of the testator that the stock should not be disposed of until such time as in the judgment of the executors it would be for the benefit of his estate, as he had great faith in the future value of the company, and also great faith in the vast importance to his wife and children of the immense distillery business.

What is a fair and reasonable compensation for the executors? That and that only is the question, and the answer depends upon the size of the estate; the responsibility incurred by them; and the work and labor done. The exceptant realized that the executors were entitled to at least three per cent on $2,000,000 at this time. We think they are entitled to more.

The testator himself on April 18, 1900, entered into an agreement with the Fidelity Trust Company, in which he agreed to appoint the company one of the executors and trustees under his will, and he provided that they should have a commission of one and one-half per centum on the principal of his estate if it inventoried over $1,000,000, and a commission of two per centum on the income; and that they should have for acting as trustee two per centum on the income, and an allowance of one-half of one per cent on reinvestments. The compensation of the company was graduated if the inventory was over $500,000, and less than $1,000,000 or if it was $100,000 and less than $500,000.

The agreement also provided that the company's compensation should be outside of the compensation of other executors and trustees which the decedent was to fix. Now there can be no question as to the compensation of the fidelity company as one of the executors. They are entitled to one and one-half per centum on the principal and two per centum on

the income. The other executors are as much entitled to a reasonable and fair compensation as the fidelity company, because they have had an equal responsibility and have performed their fair share of the labor in connection with the administration of the estate.

The commission claimed is five per cent on $2,446,892.81, or $122,344.64.

Under all the facts and circumstances, in. view of the responsibility imposed upon the accountants, and the labor which their duties required, we are of the opinion and so find that the compensation claimed is fair and reasonable and just. Another fact which should be taken into consideration, and which is entitled to weight, is that as trustee, these accountants will have a very great deal of responsibility and labor, and cannot, under the law, receive dual commissions, both as executors and trustees. What they now receive as executors upon the corpus of the estate must be for all time.

In allowing the commission, it must be understood that no additional compensation will be allowed the accountants in the conversion of the assets of the estate now in their hands, unless it is made to appear to the satisfaction of the court, that by reason of some further responsibility they should be additionally compensated.

We have now passed upon every matter, claims and compensation of accountants raised at the audit.

The assets embraced in the trust account are awarded back to the executors for further accounting.

*Errors assigned* were in dismissing exceptions to adjudication.

*N. H. Larzelere*, with him *M. Hampton Todd*, for appellant. —If this court adheres to its rulings in a long line of cases, the decree of the lower court must be reversed: Harrison's Est., 217 Pa. 207; Young's Est., 204 Pa. 32; Whelen's App., 70 Pa. 410; Oliver's Est., 20 W. N. C. 318; Allen's App., 125 Pa. 544; Montgomery's App., 86 Pa. 230.

*Wm. Rudolph Smith*, with him *Henry Pleasants*, for ap-

pellees.—In arriving at the compensation to which a trustee in any capacity is entitled, it is necessary to consider the amount of the estate, the labor performed and the responsibility imposed: Lilly's Est., 181 Pa. 478; Harrison's Est., 217 Pa. 207; Wistar's Est., 192 Pa. 289; Moore's Est., 211 Pa. 338.

OPINION BY MR. JUSTICE STEWART, April 12, 1909:

That the administration of this large estate, so far as it has been proceeded with, has been wisely and judiciously accomplished by the executors, is conceded. The principal effort however up to the time of accounting, has been to conserve, not convert, only because the testator in his will so advised. There is but a single exception to the adjudication in the court below, and that relates to the compensation allowed the executors. The compensation of the Fidelity Trust Company, one of the executors, was made the subject of contract in the lifetime of the testator, and with that we have no concern. The auditing judge allowed the executors a commission of five per cent on the total inventoried and appraised value of the estate, and a like percentage on some additional items omitted from the inventory. Their compensation, as thus determined, amounts to $122,344.64.

The basis on which compensation must be determined in every case where it takes the form of a commission, is the amount of the estate administered upon and accounted for. With this amount ascertained, such per centum rate may be allowed thereon as in the opinion of the auditing judge will afford just and reasonable compensation to the accountants. We have frequently recognized the method as a convenient and entirely suitable way of determining compensation; but it can easily be misapplied, and made to give a seeming fairness to inequitable results. Ordinarily it is safe enough to adopt the total debit side of an account as the basis for the per centum assessment in these cases, for ordinarily such total represents the extent of the conversion that has taken place. But not always so. There are exceptional cases, and this is one of them. Here the executors have charged themselves with the entire inventoried estate at its appraised value, and

have been allowed a commission of five per cent thereon, while the account shows that they have not converted a single item included in the inventory. If the estate, as inventoried, was to be distributed without conversion, that is to say, in specie, that would be an entirely different matter. Nothing of the kind, however, is intended. The order of adjudication expressly recommits these specific assets, amounting at their appraised value to $2,351,830.20, into the hands of the accountants to be converted by them and thereafter accounted for. Until such conversion shall have been accomplished no compensation will have been earned as to these assets, and therefore none should be allowed. Here they have been allowed by way of anticipation as appears from the order recommitting the assets. That order directs that they be converted by the executors without further compensation. The inequity of such an adjudication is apparent. Suppose for some reason the place of these executors should become vacant—a contingency perhaps too remote to be seriously considered in this particular case, but a contingency which not unfrequently occurs in the estates of decedents—and the duty of converting these assets should fall upon their successors, where would the compensation of the successors come from? Would it not necessarily result that the estate would be taxed twice for the same service? We express no opinion as to what would have been proper compensation had the whole estate been administered upon and accounted for. It will be time enough to meet that question when the condition arises. It is enough to know that it has not yet been accounted for, and that the accountants have been allowed a compensation which exceeds in amount all that they have actually received, according to the account filed, and for which they are liable by reason of their accounting. We have not overlooked the fact that the account does not include the income derived by the accountants from the unconverted assets, and that such income is exhibited in a separate statement filed. There can be no reason why it should not be embraced in the account, made part of it. Only as it is thus accounted for can commissions be allowed thereon. The case calls for a restatement of the

account along the lines we have indicated. Until this is done, it cannot be made to appear by percentage or otherwise what would be just compensation to the accountants. This is for the auditing court in the first instance. We have simply indicated the proper method of reaching the result.

The decree, so far as it embraces the compensation of the executors, is reversed; and the record is remitted with directions to proceed in the matter of the adjudication in accordance with the methods and principles we have here indicated.