## Gardner's Estate.

Argued April 9, 1936. Before KEPHART, C. J., SCHAF-FER, MAXEY, DREW, LINN and STERN, JJ.

*Leonard A. Mazer,* for appellants.

*James S. Crawford,* of *Patterson, Crawford, Arensberg & Dunn,* for appellee.

OPINION BY MR. JUSTICE MAXEY, June 26, 1936:

Appellant, guardian of the estates of three minor remaindermen, complains of the failure of the court below, in adjudicating the surviving executor's account, to surcharge it because of the shrinkage in the value of securities it held when it should have sold them (so appellant contends) in order to discharge debts of the estate. Complaint is also made of the allowance of executor's commissions,

The testator, Gardner, died on December 28, 1930, possessed of a large estate, inventoried at $887,581.77, consisting almost entirely of marketable common stocks. By the first article of his will he directed his executors, his widow and appellee herein, Peoples-Pittsburgh Trust Company, "to pay my just debts and funeral expenses as soon as conveniently can be done after my decease." The bulk of his estate testator bequeathed to his executors as trustees, to invest the same and pay the income, one-half to his wife for life, and the balance to his three living children for life, and the children of his deceased daughter, with clauses of survivorship. Appellant was appointed guardian of the estates of the minor children of a son who died November 10, 1934, and for whom appellee is trustee during their minority. No other party in interest appealed or took exception to the account. The trustees were granted by the will "full power . . . to keep and retain any and all investments existing at the time of [testator's] death so long as their judgment shall or may approve," with the further right in their discretion to invest in nonlegal securities. The concluding paragraph of the will confers upon his executors as such all the powers given the trustees. Appellee has acted as sole executor since the widow's death on June 18, 1932.

At his death testator owed large sums to two Pittsburgh banks, representing loans secured by collateral. One of these was upon a demand note for $134,000, secured by stock, pledged to the creditor bank, of the value of $163,900 at decedent's death. The other consisted of his indebtedness in two stock pools, in which his liability was $59,650, also represented by notes held by a bank, upon which the collateral pledged was worth $91,346.67 at the time of his death.

The executors were promptly granted letters testamentary, but they did not at once proceed to liquidate the assets and pay off the loans. It now appears that if this had been done a saving of many thousands of dollars

would have been effected for the estate. Instead, however, a conference was held by appellee's trust officers with members of the family, including testator's widow and two sons, and it was concluded that for the then present, at least, the securities then in the estate should be held and not sold at prices currently believed to be less than their real value. Testator through his business connections had had a personal interest in some of the companies whose securities he held, and at his death was vice-president of United Engineering & Foundry Company, in which he held a large block of stock. All the stocks were high grade industrials, and all were then paying dividends.

The vice-president of appellee's trust department, Holland, who had personal charge for the company of handling the estate, testified in detail as to the attention paid to the matter of liquidating decedent's loans. Dating from February 5, 1931, less than a month after the grant of letters, the condition of the estate was reviewed at regular intervals by the trust committee of appellee's board of directors, which consisted of men of high financial standing and sound judgment in the business world. The account was reviewed from week to week, and even oftener, by Holland and other trust officers and by appellee's statistical experts. Reference was had to standard sources of information about the securities, and inquiry was made from time to time of officials of some of the corporations whose stocks were held. The adult beneficiaries were unanimous in agreeing that the stocks should be retained and the loan held open. The attorney for the estate had the same view. It is a matter of common knowledge that at that time and for a long time thereafter this entire country was in the throes of a financial and industrial catastrophe and this was reflected in the stock market. It was the judgment of those interested in this case that to hold stocks and not to sell them was the part of wisdom. The decision of the trust company to this effect was the result of attentiveness to the

interests of the beneficiaries and bespoke a conscientious effort to exercise its discretion in the interest of those it served.

Two months after decedent's death the bank which held the note for $134,000 demanded payment. To protect the collateral securing it, appellee paid the debt and purchased the note from the bank with the collateral attached, thereafter carried it as a loan in its banking department, and paid itself interest out of the estate.

The estate was thoroughly solvent and at no time were the rights of creditors imperiled. Nevertheless its condition was such that for the bank loans to be paid stock would have to be sold. The executor finally concluded that this ought to be done. Partial liquidation by sales of securities took place in December, 1931, realizing $65,-089.17, which was used to pay taxes and part of the bank loan on the stock pools. This figure was $61,183.50 less than the appraised value of the securities at the time when accountant received them. The balance of this loan and a part of the estate's indebtedness to accountant on the note for $134,000 were paid by a transfer from income in May and June, 1932. From May to July, 1933, further sales were made, on some of which a small gain resulted, but this was more than offset by losses. The net loss to the estate on these sales, below inventory values, was $67,021.49. With the proceeds the bank loans were finally paid off. When the income deficit was made up by a transfer from principal, in February, 1935, a further loss was sustained of $1,638.25. There were also payments of interest made on the loans, which would have been unnecessary had they been promptly liquidated. This, however, was probably offset by receipt of income from the securities retained. The sales in February, 1935, resulted in a net loss of $12,563.17. Thus the total depreciation in the value of the estate occasioned by the delay in selling the securities amounted to approximately $142,000, if appraised values are to be accepted as those at which liquidation could have been

effected. It was shown that the average market values of the respective securities during the six months following the grant of letters, during which they could have been sold, were at least as high as the inventory figures, and in some cases higher.

The executor's account was filed March 1, 1935, largely at the insistance of appellant and the administrator of testator's deceased son. It clearly shows a severe depreciation in the value of the estate, and that this was due to appellee's earlier decision to refrain from selling. Appellant insists that the executor should be surcharged with the losses, pointing to the duty of the executor to file an account within six months after the grant of letters, as required by section 46 (a) of the Fiduciaries Act of June 7, 1917, P. L. 447, and to our numerous decisions stating that an executor's or administrator's primary duty is to liquidate his decedent's assets and pay debts: *Johnston's Est.*, 9 W. & S. 107; *Merkel's Est.*, 131 Pa. 584, 18 A. 931; *Constable's Est.*, 299 Pa. 509, 149 A. 743; *Gilliford's Est.*, 281 Pa. 582, 127 A. 238; *Stephen's Est.*, 320 Pa. 97, 181 A. 559; *Taylor's Est.*, 277 Pa. 518, 121 A. 310; *Riebel's Est.*, 321 Pa. 145, 184 A. 118.

Our cases show, however, that the rule is subject to exceptions, especially where, as here, creditors are not subject to the hazard of insolvency. As was said by Judge GUMMEY, whose opinion we approved in *Borell's Est.*, 256 Pa. 523, 524, 100 A. 953: "Ordinarily it is the duty of an executor to convert personal property within the year following the grant of letters testamentary *(Merkel's Est.*, 131 Pa. 584, 612 [18 A. 931] ), and the rule is to be more strictly construed where the rights of creditors are affected than in cases where the estate is solvent; but the rule is not an unbending one *(Dauler's Est.*, 247 Pa. 356 [93 A. 511] ); if it were, the result would be to divest an executor of a large part of the discretion which the testator gave him and would in many instances impose great hardship upon the residuary legatees, who have the right to take in kind the se-

curities remaining after the payment of the testator's debts, the costs of administration, and any specific or pecuniary legacies given by the will." Where the rights of legatees only are involved, a more liberal view of the executor's discretion is to be adopted: *McNair's App.,* 4 Rawle 148, 157; *Semple's Est.,* 189 Pa. 385, 389, 42 A. 28.

As Mr. Justice LINN said in *Stephen's Est.,* supra, at page 102: "It is true that ordinarily an executor should, as expeditiously as possible, convert his decedent's personal property in possession, but this rule varies with circumstances." A circumstance to be considered in the case at bar is the want of any insistent creditor, who would be entitled to demand that the payment of his debt be not postponed to indulge the executor's hope of enhancing the distributees' shares, by waiting for the value of the estate's assets to be increased by the turn of events. Another is the fact that all parties in interest who were *sui juris* agreed that delay in liquidation was desirable and joined in requesting it. Still a third is the broad power of retention, noted above, conferred on executors as well as trustees by decedent's will. When to these are added the further consideration that the question arose at a time of economic chaos when no one could with any degree of confidence chart the future, it is clear that the situation was one for the exercise of a judgment which no one could reasonably expect to approach infallibility. We said in *Riebel's Est.,* supra, at page 147: "Even in the cases of executors and trustees, if common prudence and good faith are exercised, they will not be surcharged for retention of such securities."

The record plainly shows that discretion was honestly and faithfully exercised, upon information received from sources at that time believed to be reliable. This was typically a case where, in words often quoted, the "retention of the securities in question represents, not a mere lack of attention, but an honest exercise of judgment based on actual consideration of existing condi-

tions": *Taylor's Est.*, 277 Pa. 518, 528, 121 A. 310; *Brown's Est.*, 287 Pa. 499, 502, 135 A. 112; *Dempster's Est.*, 308 Pa. 153, 160, 162 A. 447. To demand more would require of a fiduciary a prescience which only the most self-confident of mortals make any pretensions to, and which not even the wisest attain. Under the circumstances here present the accountant was not bound to close out the loan accounts at what was then reasonably adjudged to be an unnecessary sacrifice of the beneficiaries' interest. The court below was amply justified in refusing to surcharge for the loss.

Appellant complains that the executor has been allowed credit for payment to itself of interest on the note for $134,000 which it took over, with the collateral securing it, when the bank which held it demanded payment. This objection is without force. The record makes clear that the only reason for which this was done was to relieve the estate of the bank's embarrassing demand for payment of the note. The executor, in its discretion, thought best to purchase the note, with its collateral, and retain the securities pledged without immediately selling them. It advanced its own money for the purpose and was clearly entitled to interest from the estate.

One small item in the account must be discussed. This consisted of a warrant to purchase 40 shares of stock of the National Steel Company, carried in the inventory at $310. Credit in the account is claimed for a total loss on this item by reason of the fact that in October, 1934, the right expired and had not previously been exercised. It apparently had value when received by accountant. The executor had the burden of showing that the loss was sustained without fault on its part, and there is certainly nothing in the evidence which it produced to justify any such conclusion. Since it will be necessary to recommit the account to the court below on the question of commissions, as hereinafter discussed, further evi-

dence should be received at that time as to the precise reasons why this loss was sustained and the warrant was allowed to expire. To sustain this credit the accountant must show, in whatever way it can, that its efforts to realize on this asset before the expiration date were unavailing.

The further question remains as to the amount of compensation allowed the executor. In the account, compensation is claimed on the basis of the inventory value of the corpus, plus accretions realized through gains on sales of securities and reappraisals of portions thereof when transferred to income account. The computation is at the rate of 5 per cent on the first $100,000, 3½ per cent on the next $150,000, 2½ per cent on the next $250,000, and 2 per cent on the balance of $396,176.16. Five per cent is claimed on income receipts of $105,344.68, and the estate of testator's widow was awarded one-half of one per cent on corpus, valued as stated above, as compensation for her services during the brief period of her incumbency as coexecutor. The whole amount allowed was at the rate of almost 3½ per cent on the whole, which the court below justified on the ground of extraordinary services and the duration of administration.

The refusal of the surcharge on the ground of negligence prevents denial of all compensation to the executor, for which appellant contends. Objection is made, however, that commissions were allowed on gains resulting from sales or reappraisals of securities, although the executor was not penalized correspondingly where losses (which were far greater) were sustained, but the basis used was the inventory value. There is merit in this contention. "The rule as to commissions in all cases is compensation for the responsibility incurred and the service and labor performed": *Harrison's Est.*, 217 Pa. 207, 209, 66 A. 354; *Wistar's Est.*, 192 Pa. 289, 298, 43 A. 1006; *McCaskey's Est.*, 307 Pa. 172, 160 A. 707. Where com-

pensation is assessed as a percentage of total assets administered, the rule, as we have applied it and as customarily applied in the orphans' courts throughout the State, is to allow commissions on the appraised value of the corpus at the time when it reaches the hands of the executor or administrator. This is the value of the assets actually administered. Subsequent accretions should not increase the allowance of compensation, nor losses reduce it, unless exceptional circumstances in fairness require that this be done: see *Davidson's Est. (No. 1)*, 204 Pa. 381, 54 A. 273; *Riter's Est.*, 260 Pa. 168, 103 A. 554. There may be instances where the fiduciary's management of the estate has been so exceptionally skillful, and the care and attention bestowed upon it reveal the exercise of such unusually good judgment, and results in augmenting the estate beyond reasonable expectation, that it would be proper to allow commissions on an increase in corpus: *Semple's Est.*, 189 Pa. 385, 42 A. 28. Here, however, no such circumstances exist and appellant's objection is well taken. The executor filed its account more than four years after receiving the assets, but during this time it did no more than it must have done had it promptly liquidated the loans, filed its account, and thereafter administered the same assets as testamentary trustee. During that period it did merely what it would have been under duty to do as trustee, so far as conserving the assets is concerned.

Nor can we approve of the method by which compensation was computed, on a graduated scale. Where commissions are not allowed as a lump sum, as has been the practice in a number of cases *(Wistar's Est.,* supra; *Brooks's Est.,* 249 Pa. 66, 94 A. 478; *Gilpin's Est.,* 138 Pa. 143, 20 A. 713), a percentage basis has been the accepted method of computing them. By recalculation, as mentioned above, the court below granted the executors nearly 3½ per cent of both principal and income as the reward of its labor and responsibility. Under our cases,

where an estate of this size is administered, with assets approaching a million dollars, and particularly where the executor in practical effect exercises the functions of the trustee which it will ultimately become, and where the services and responsibility involved are not of an unusual character, compensation in excess of 3 per cent on *both* income *and* corpus received has rarely been allowed, although compensation of more than 3 per cent has sometimes been allowed on income alone: *Wistar's Est.*, supra; *Whelen's App.*, 70 Pa. 410; *Young's Est.*, 204 Pa. 32, 53 A. 511; *Moore's Est. (No. 2)*, 211 Pa. 343, 60 A. 989; *Kelley's Est. (No. 1)*, 250 Pa. 172, 95 A. 400; *Taylor's Est.*, 281 Pa. 440, 126 A. 809; *Griffith's Est.*, 96 Pa. Superior Ct. 242; *Ott's Est.*, 103 Pa. Superior Ct. 55, 158 A. 286. Each case is sui generis. We think that here compensation equalling 3 per cent on both principal and income is ample. As between the surviving executor and the estate of the deceased executor, proportionate distribution, in accordance with the respective services of each, is to be decreed with the above as a basis.

The contention that no allowance should be made of commissions on unconverted assets, which will become part of the trust estates in the hands of the same accountant, and of which the greater portion of the balance for distribution is composed, finds no support in our cases. Payment of commissions is postponed only where the assets are awarded back to the executor for further accounting: *Sinnott's Est.*, 224 Pa. 333, 73 A. 348; *Gongaware's Est.*, 265 Pa. 512, 109 A. 276.

The account should be remitted to the auditing judge for supplemental proceedings in conformity with this opinion, on the question of the one item of credit above mentioned and for the allowance of proper commissions or compensation to the executors.

As thus modified, the decree of the court below is affirmed, costs on this appeal to be paid from the estate.